IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DONNA CRYSTLE RHODES,

             Plaintiff,

       v.                                Civil Action No. 3:09-CV-48

MICHAEL J. ASTRUE,
Commissioner of Social Security,

             Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.      Background

      Plaintiff, Donna Rhodes (Claimant), filed a Complaint on July 13, 2009, seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of

Social Security, (Commissioner).[1]  Commissioner filed his Answer on November 16, 2009.[2]

Claimant filed his Motion for Summary Judgment on January 13, 2010.[3]  Commissioner filed his

Motion for Summary Judgment on March 10, 2010.[4]

B.      The Pleadings

      1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 13.

[3] Docket No. 18.

[4] Docket No. 23.

2. <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C. <u>Recommendation</u>

I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's decision that Claimant did not suffer from a Listing impairment, the ALJ correctly evaluated Claimant's credibility, and the ALJ correctly evaluated Claimant's alcohol use.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on September 21, 2004, alleging disability since June 1, 2003, due to hypertension, panic attacks, depression, PTSD, chronic obstructive pulmonary disease, arthritis, migraines, and drinking problems. (Tr. 91). The claim was denied initially on December 28, 2004, and upon reconsideration on September 8, 2005. (Tr. 40, 39). Claimant filed a written request for a hearing on November 8, 2005. (Tr. 50). Claimant's request was granted and a hearing was held on January 31, 2007. (Tr. 584-611).

The ALJ issued an unfavorable decision on March 20, 2007. (Tr. 14-29). The ALJ determined Claimant was not disabled under the Act because she had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Regulation No. 4 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526,

416.920(d), 416.925, and 416.926), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR §§ 404.1560(c), 404.1566, 416.960(c), and 416.966. (Tr. 19-22). On March 26, 2007, Claimant filed a request for review of that determination. (Tr. 13). The request for review was denied by the Appeals Council on July 11, 2008. (Tr. 7-9). Therefore, on July 11, 2008, the ALJ's decision became the final decision of the Commissioner.

Claimant filed a second application for SSI on June 6, 2007, and DIB on June 7, 2007, alleging the same symptoms as well as worsening pain in her legs and more severe and frequent panic attacks. (Tr. 726, 799). The claim was denied initially on October 24, 2007, and upon reconsideration on January 15, 2008. (Tr. 679,689). Claimant filed a written request for a hearing on February 13, 2008. (Tr. 692). Claimant's request was granted and a hearing was held on January 8, 2009. (Tr. 612-634). After dismissing Claimant's second application for DIB, the ALJ issued an unfavorable decision on January 30, 2009. (Tr. 643-58). The ALJ determined Claimant was not disabled under the Act because she had no impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR §§ 416.960(c) and 416.966). (Tr. 643-58). Claimant filed a request for review of that determination, which was denied by the Appeals Council on May 19, 2009. (Tr. 639-41). Therefore, on May 19, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

3

B.     Personal History

Claimant was born on January 12, 1976, and was twenty-seven (27) years old as of the

onset date of his alleged disability and thirty-one (31) as of the date of the ALJ's decision.  (Tr.

66).  Claimant was therefore considered a "younger person," under the age of 50 and, generally,

whose age will not seriously affect the ability to adjust to other work, under the Commissioner's

regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c) (2009).  Claimant completed her GED (Tr.

589).  Claimant has relevant past working experience as a child caretaker.  (Tr. 98, 589-90).

C.     Medical History

The following medical history is relevant to the issue of whether substantial evidence

supports the ALJ's determination that Claimant's subjective complaints were not entirely

credible and whether Claimant's impairments equaled the severity criteria for the Listings:

**New Patient Worksheet & Summary, University Health Associates, 5/26/99 (Tr. 479-90)**
- no significant past medical history except for headaches
- general physical examination and neurological examination is normal
- assessment: communicating hydrocephalous could be congenital in view of a nondraining sinus tract over her lower spine which could represent spina bifida

**Letter from Dr. Bloomfield, Department of Neurosurgery, West Virginia University School of Medicine, 5/27/99 (Tr. 491)**
- neurological exam is normal; fundiscopic exam is normal without any evidence of papilledema
- clinical impression: unsure why numbness exists - may be seizure-related because of their rapid onset and offset

**Electroencephalogram Report, West Virginia University Hospitals, Dr. Gutierrez, 6/3/99 (Tr. 492-93)**
- diagnosis: normal awake and asleep
- clinical impression: normal awake and asleep EEG

**Emergency Department Records, Davis Memorial Hospital, 6/28/03 (Tr. 158-62)**
- chief complaint: acute pain in right side of chest; moderate back pain from fall
- clinical impression: contusions in chest and back
- x-ray results:
        - lungs are well inflated and clear; heart and mediastinal contours are unremarkable; no

4

pleural abnormalities
- impression: negative examination of chest
- impression: no abnormalities in right ribs

**Outpatient History and Physical Examination, West Virginia University Hospital, 6/29/99 (Tr. 495)**
- history/complaints: return visit; spells of numbness; frequently occurring headaches
- exam:
    - appearance: alert
    - orientation: oriented
    - memory: illegible
    - attention: illegible
    - knowledge: appropriate
    - language/speech: illegible

**Progress Notes, Dr. Roberts, 7/18/03-8/12/05**
Lab Result - CT Head w/o and with contrast 7/21/03
- indications: increased headaches
- mild ventriculomegaly; prominent cisterno magna but appearance and configuration is stable; no obvious parenchymal abnormality or midline shift; no abnormal enhancement; no hemorrhage or mass effect
- impression: ventricular prominence - remain stable; no new abnormality
Chest, PA & Lateral 8/19/03
- reason for exam: hypertension
- impression: no acute cardiopulmonary abnormality; pleural based density seen along the right sixth rib is believed to be a healing fracture site
Ankle, Complete 3 Views - left 9/13/03
- full result: joint-normal: bony mineralization is normal
- impression: negative exam
CT Head w/o and with contrast 8/25/04
- reason for exam: headache and head numbness
- impression: persistent ventriculomegaly with no recognizable interval change over the past several years; etiology is unclear - involves third and lateral ventricles; no new lesions found
Pelvis Ultrasound 9/17/04
- reason for exam: pelvic pain
- impression: no significant abnormality found
Sacrum-coccyx (min 2 views) 1/31/05
- full result: no bony or soft tissue abnormalities
Spine, lumbo-sacral min 4 views 1/31/05
- impression: minimal narrowing of L4-5 disc; unilateral spondylolysis at L5 on the left
MRI lumbar w/o contrast 1/31/05
- impression: small right paracentral disc bulge at L4-5; no spinal or foraminal stenosis seen
MRI-brain, w/o followed by with 3/21/05
- history: headaches, communicating hydrocephalus

- impression: ventricles appear slightly prominent, but no significant degree of ventricular dilation; no other abnormality identified in brain

Knee, complete (min 4 views) 6/3/05
- history: osteoarthritis and pain
- mild DJD - no acute bony abnormality identified

PN 7/18/03
- notes: panic attack, depression
- impression/plan: GERD; illegible

PN 7/21/03
- chief complaint: increased BP, headaches, visual disturbance
- plan: increased medications

PN 8/20/03
- chief complaint: follow-up HTN
- impression/plan:
 - GERD & hiatal hernia - increase medications
 - depression

PN 11/5/03
- chief complaint: follow-up

PN 2/16/04
- chief complaint: pulled neck muscle
- impression/plan: treat with medication

PN 1/7/04
- chief complaint: non-productive cough, chest sore
- impression/plan: bronchitis - medication

PN 2/12/04
- chief complaint: depression
- impression/plan: depression, anxiety - start Lexapro

PN 3/8/04
- chief complaint: sneezing, watery eyes, cough
- impression/plan: medications

PN 3/11/04
- chief complaint: follow-up depression
- impression/plan: medications

PN 3/25/04
- chief complaint: follow-up depression; doing better
- impression/plan: depression - medications

PN 5/7/04
- chief complaint: arm through glass window one week ago - reddened skin around laceration
- impression/plan: lacerations - medications

PN 8/17/04
- chief complaint: discuss RX; anxiety; insomnia
- impression/plan:
 - depression - medication
 - PTSD - medication

- GERD

<u>PN 8/26/04</u>
- chief complaint: headaches, numbness
- impression/plan: hypertension, COPD, depression - medications

<u>PN 9/8/04</u>
- chief complaint: pressure when urinating; light vaginal bleeding
- impression/plan: depression; illegible

<u>PN 9/14/04</u>
- chief complaint: left ankle pain
- impression/plan: sprained ankle - ankle wrap

<u>PN 9/21/04</u>
- chief complaint: slight pressure when urinating remains
- impression/plan: recent UTI; illegible

<u>PN 11/19/04</u>
- chief complaint: 3 panic attacks in 12 hours; seizure
- impression/plan:
    - HTN - stable
    - COPD - sob - smokes ½ ppd
    - depression/panic attacks

<u>PN 1/26/05</u>
- chief complaint: low back pain; ear pain improved
- impression/plan: back pain, HTM, COPD, depression

<u>PN 2/2/05</u>
- chief complaint: low back pain remains same; right leg pain; difficulty sleeping
- notes: MRI lumbar - small right para center disc bulge at L4-5; unilateral spondylolyic at L5 on the left
- impression:
    - disc bulge L5 - refer to PT
    - HTN - medication

<u>PN 3/3/05</u>
- chief complaint: headache, productive cough, low back pain
- impression/plan: bronchitis, HTN

<u>PN 3/11/05</u>
- chief complaint: low back pain; headache; cough improved
- impression/plan: bronchitis; HTN

<u>PN 3/30/05</u>
- chief complaint: MRI results; headaches
- impression/plan: tension HA; DDD with disc bulge at L4-5; COPD

<u>PN 5/5/05</u>
- chief complaint: back and leg pain; cough green mucus
- impression/plan:
    - cough - Z-pack
    - LLBP pain/numbness right leg - increase medications

PN 6/6/05
- chief complaint: migraine; knee pain
- impression/plan: medication
PN 7/14/05
- chief complaint: medication not helping
- notes: pain in hands, fingers, wrists, elbows, knees, and ankles; occasionally red and swollen
- impression/plan: medications
PN 8/12/05
- chief complaint: ER follow-up back pain
- notes: knee pain; ankle pain; low back pain
- impression: bulging disc L-5; illegible

**Outpatient History and Physical Examination, West Virginia University Hospital, 7/27/99 (Tr. 496)**
- history/complaints: follow-up visit; numbness in hands and face; difficulty in speech; no headaches
- exam:
> - appearance: alert
> - orientation: oriented x 4
> - memory: intact
> - attention: good
> - knowledge: appropriate
> - language/speech: illegible

**Clinical Evaluation, Elkins Family Counseling Center, Karen Flynn, 8/25/03 (Tr. 236-39)**
- mental status exam: dressed and groomed appropriately; oriented in all four spheres; good eye contact; appropriate weight; motor and speech patterns were within normal limits; pleasant, alert, cooperative; expressed great deal of depressive ideation and appeared sad; past thoughts of suicide; thought processes appeared logical and linear; denied hallucinations and delusions; intellectual ability appeared below average with fair judgment and insight
- tests administered:
> - Kaufman Brief Intelligence Test (K-BIT)
> - Wide Range Achievement Test, Rev. 3 (WRAT-3)
> - Bender Gestalt Visual Motor Screening Test (Bender)
> - Addiction Severity Index (ASI)
> - Substance Abuse Subtle Screening Inventory, Rev. 3 (SASSI-3)
> - Minnesota Multiphase Personality Inventory, Rev. 2 (MMPI-2)
> - House-Tree-Person Projective Drawings (HTP)
- results and interpretations
> - K-BIT: functions within below average range of intellectual abilities - composite IQ of 86, vocab standard score of 80, Matrices standard score of 94
> - WRAT-3: scores somewhat lower than to be expected - reading score of 67, spelling score of 65, arithmetic score of 81
> - Bender: within normal limits

- ASI: medical problems - 8; employment problems - 5; alcohol problems - 8; drug problems - 0; legal problems - 3; family/social problems - 3; psychiatric problems - 8
- SASSI-3: low probability for substance dependence disorder
- MMPI-2: exaggerated her responses in attempt to obtain treatment, since there is no obvious financial gain involved and "faking bad" would not improve her position with CPS
- HTP: experiences feelings of inadequacy and insecurity, passive indecision and dependency, lack of warmth in home life
- diagnostic impression:
- Axis I (primary): 296.33 major depressive disorder, recurrent, severe without psychotic features
- Axis I (secondary): 305.00 alcohol abuse; 995.81 physical abuse of adult; 300.81 (rule out) somatization disorder
- Axis II: V71.09 no diagnosis
- Axis III: migraines, arthritis, hiatal hernia, hypertension, COPD, acid reflux, "abnormally small brain", history of bulimia
- Axis IV: problems with primary support group; occupational problems; problems related to interaction with legal system
- Axis V: GAP = 58
- summary: severely depressed and overwhelmed by responsibilities and problems in her life; inadequate coping skills, limited intellectual ability; occasionally abuses alcohol; recommend psychiatric consultation and individual therapy sessions

**Emergency Department Records, Davis Memorial Hospital, 8/28/03 (Tr. 163-72)**
- chief complaint: pelvic pain - sharp; vaginal bleeding
- clinical impression: acute pelvic pain; vaginal bleeding; cervicitis; acute urinary tract infection
- ABD Complete Acute w/ PA Chest: no acute cardiopulmonary process; air and fecal material in colon; no evidence of obstruction or free air; no abnormal calcifications – non-specific findings

**Neurological Exam, University Health Associates, Dr. Brick, 9/3/03 (Tr. 259-65)**
- chief complaint: headaches - throbbing
- examination: healthy-appearing; discs are flat; visual fields are normal; no bruits over head or neck; orientation, memory, attention, knowledge, language, and speech are normal; cranial nerves, gait, and coordination are normal; sensation to pinprick and muscle tone and strength are normal; stretch reflexes are normally brisk and symmetrical
- assessment: migraines; enlarged ventricles; communicating hydrocephalus

**Emergency Department Records, Davis Memorial Hospital, 9/13/03 (Tr. 173-77)**
- chief complaint: injury to left ankle
- clinical impression: left ankle sprain
- x-ray results: bony mineralization is normal; no traumatic or destructive lesions seen; joint spaces and articular surfaces are well preserved; no soft tissue abnormalities found – negative exam

**Pharmacologic Management Progress Notes, Appalachian Community Mental Health Center, Dr. Chandran, 12/1/03-9/2/08 (Tr. 266-302 & 436-47 & 499 & 577-79 & 864-71 & 946-52 & 983-84)**

DUI Intake Summary 12/2/03
- presenting problem: referred after receiving her first DUI offense
- mental status: well-groomed; able to maintain eye contact; denies suicidal ideation; admits to thoughts of self-harm while drinking; denies experiencing any hallucinations or delusions; feels paranoid; flat affect, good mood, well-oriented; easily agitated; poor short-term memory; long-term memory depends on the situation
- clinical impression: needs to complete the WV Alcohol Safety and Treatment Program; rule out major depressive disorder, recurrent
- diagnostic impression (provisional):

|  |  |  |
|---|---|---|
| - Axis I (primary) | 3.05.00 | alcohol abuse |
| - Axis II | V71.09 | no diagnosis |
| - Axis III | Z03.2 | no diagnosis |
| - Axis IV | 8 | legal DUI |
| - Axis V | GAF 61 |  |

- preliminary services needed: WV Alcohol Safety and Treatment Program
- initial treatment goals/outcomes: maintain alcohol abstinence

Intake Summary 3/18/04
- presenting problems: diagnosed with depression; reported for therapy and psychiatric evaluation
- mental status: pressured speech; somewhat tense; only sleeps 2 hours each night; poor appetite; energy depends on mood; denies suicidal thoughts; appropriate, anxious affect; denies hallucinations, delusions, and paranoia; moody; bad short-term and long-term memory; easily distracted with poor concentration; oriented to all four spheres
- clinical impression: appeared anxious and tense; may be addicted to caffeine; denies alcohol is a problem; wants to be treated for mental illness
- diagnostic impression - provisional:

|  |  |
|---|---|
| - Axis I (primary) | 296.32 major depressive disorder, recurrent, moderate |
| - Axis I (secondary) | 303.90 alcohol dependence, early full remission |
| - Axis I (tertiary) | 300.01 panic disorder without agoraphobia |
| - Axis II | V71.09 no diagnosis |
| - Axis III | Z03.2  no diagnosis |
| - Axis IV | 4      unemployed |
| - Axis V | GAF 61 |

- preliminary service needs: service coordination with monthly contact, therapy, and a psychiatric evaluation with medications
- initial treatment goals & outcome: receive therapy to decrease depression and anxiety; to see a doctor to be placed on better medications that will work

Comprehensive Psychiatric Evaluation 6/22/04
- chief complaint: bad depression
- mental status examination: alert and oriented; no acute distress; difficulty carrying on conversation and spoke fast, unclear, very soft, and somewhat tangential; no current suicidal or

homicidal ideations; no auditory/visual hallucinations; insight and judgment are rather limited to fair
- assessment

|  |  |  |
|---|---|---|
| - Axis I | PTSD - 309.81 | |
| | Mood disorder, NOS - 301.81 | |
| | Eating disorder, NOS - 307.50 | |
| | Nicotine Dependence - 305/1 | |
| | Alcohol Dependence | |
| - Axis II | deferred | |
| - Axis III | hypertension, hiatal hernia, GERD, osteoarthritis, migraines | |
| - Axis IV | social stressors, history of abuse, financial stressors | |
| - Axis V | GAF - 50 | |

- plan: continue Lexapro - uncertain whether it was working because Claimant drank alcohol; discontinue use of alcohol; begin Seroquel; arrange meeting with therapist; begin to taper down use of caffeine and smoking

Pharmacologic Management 7/20/04
- objective: pleasant/cooperative; demonstrated no agitation/combativeness; fairly fidgety/tremulous; remained alert and oriented; dysthymic, anxious mood; frustrated affect; no suicidal/homicidal ideations, auditory/visual hallucinations, delusions, or paranoia
- assessment:
    - recurrent major depression, severe without psychotic features - 296.33
    - PTSD - 309.81
    - eating disorder NOS - 207.50
    - alcohol dependence in full remission
    - nicotine dependence - 305.10
    - multiple medical problems
- plan: increase Lexapro; avoid Benxodiazepines; focus on overall behavioral modification strategies to help anxiety

Pharmacological Management 8/17/04
- current diagnosis: Axis I
    - recurrent major depression, severe without psychotic features 296.33
    - PTSD - 309.81
    - eating disorder, NOS 307.50
    - alcohol dependence, in full remission
    - nicotine dependence - 305.10
- subjective: fairly stable on medications; no side effects; some symptoms of anxiety, frustration, irritability, and PTSD; no suicidal thoughts; drinks 12 caffeinated beverages daily on average; smokes 1 ½ packs cigarettes daily; does not use any alcohol, drugs, or other substances
- objective: pleasant, cooperative, slightly fidgety, tremulous, and anxious; no tics, twitches, stereotypes or any signs of EPS/Tardive Dyskinesia; remained alert and oriented; affect was appropriately/mood-congruent; mildly distracted; racing thoughts; no suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or paranoia
- plan: continue medications; recommend consistent individual therapy and working on various modification strategies

Pharmacologic Management 9/22/04

- current diagnosis:

    - recurrent major depression, severe without psychotic features 296.33

    - PTSD - 309.81

    - eating disorder, NOS 307.50

    - alcohol dependence, in full remission - 303/90

    - nicotine dependence - 305.10

- subjective: some mood swings; irritable; depressive symptoms; decreasing cigarettes to one pack daily; working on decreasing caffeinated beverages

- objective: pleasant, cooperative, talkative; slightly fidgety and tremulous; no abnormal movements; no signs of EPS/Tardive Dyskinesia; slightly anxious, dysthymic mood; appropriate affect; no suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or paranoia

- plan: increase Lexapro and Trileptal; continue Seroquel/Vistaril; recommend consistent individual therapy and working on behavioral modification strategies, cognitive restructuring and focusing on self-awareness

Pharmacological Management 11/2/04

- subjective: smokes one pack of cigarettes daily; drinks significant amounts of caffeine; has not used alcohol for over four months; does not use any other substances; poor appetite; does not demonstrate any hazardous weight loss practices; does not report any other worsening symptoms

- objective: pleasant and cooperative; demonstrated no agitation or combativeness; slightly fidgety and anxious; no signs of EPS/Tardive Dyskinesia; anxious, dysthymic mood; affect appropriately frustrated/mood-congruent; no suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or paranoia; no worsening PTSD symptoms

- assessment

    - recurrent major depression, severe without psychotic features 296.33

    - PTSD - 309.81

    - eating disorder, NOS 307.50

    - alcohol dependence, in full remission x 4 months - 303.90

    - nicotine dependence - 305.10

- plan: increase Lexapro; continue all other medications as written; recommend consistent individual therapy to work on various behavioral modification

Pharmacological Management 2/8/05

- current diagnosis:

    - recurrent major depression, severe without psychotic features 296.33

    - PTSD - 309.81

    - eating disorder, NOS 307.50

    - alcohol dependence, in full remission x 4 months - 303.90

    - nicotine dependence - 305.10

- subjective: ongoing symptoms of depression, mood swings, irritability, and anger; daytime sedation; cannot sleep at night; ongoing anxiety and constant worrying; poor appetite; no hazardous weight loss practices; smokes one pack of cigarettes daily; drinks significant amounts of caffeine; has not used alcohol for seven months

- objective: frustrated; easily distracted; no agitation or combativeness; fidgety and anxious; no

signs of EPS/Tardive Dyskinesia; mood anxious/dysthymic; affect appropriately frustrated; no suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or paranoia; no worsening PTSD symptoms
- plan: continue Lexapro; taper off Seroquel then start Ambien; increase Trileptal; increase vistaril; individual therapy

Pharmacological Management 3/1/05
- subjective: Ambien not helping - wants back on Seroquel; mood swings; feel irritable, frustrated, depressed; passive thoughts of death and feeling overwhelmed; smokes one pack of cigarettes daily; drinks significant amounts of caffeine; has not used alcohol for seven months; not using any other substances
- objective: pleasant, cooperative; demonstrated no agitation or combativeness; fidgety and anxious; no signs of abnormal movements; mood anxious/dysthymic and affect appropriate/mood-congruent; passive thoughts of death; has PTSD symptoms
- assessment:
      - recurrent major depression, severe without psychotic features 296.33
      - PTSD - 309.81
      - eating disorder, NOS 307.50
      - alcohol dependence, in full remission x 7 months - 303.90
      - nicotine dependence - 305.10
- plan: continue medications; individual therapy

Pharmacologic Management 4/5/05
- subjective: taking her medications; difficulty with mood swings, irritability, depression, anxiety, and insomnia; smoking one pack of cigarettes daily; drinks a significant amount of caffeine; reported drinking alcohol recently; reports no use of other substances
- objective: slightly anxious/fidgety, but otherwise pleasant and cooperative; did not demonstrate any agitation or combativeness; no abnormal movements; no signs of EPS/Tardive Dyskinesia; mood slightly anxious/dysthymic and affect mood-congruent; no suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or paranoia; PTSD symptoms
- assessment:
      - recurrent major depression, severe without psychotic features 296.33
      - PTSD - 309.81
      - eating disorder, NOS 307.50
      - alcohol dependence - 303.90
      - nicotine dependence - 305.10
- plan: continue medications; maintain abstinence from substances; individual therapy

Pharmacologic Management 5/11/05
- subjective: occasional anxiety attacks, panic symptoms, occasional depressed moods and frustration; occasional passive thoughts of death; smoking one pack of cigarettes daily; denies using alcohol, drugs, or other substances
- objective: calm, less fidgety/impulsive; no signs of agitation or combativeness or abnormal movements; no signs of EPS/Tardive Dyskinesia; mood slightly dysthymic and affect appropriately frustrated; no suicidal or homicidal ideations
- assessment:
      - recurrent major depression, severe without psychotic features 296.33

- PTSD - 309.81
- eating disorder, NOS 307.50
- alcohol dependence - 303.90; in early remission
- nicotine dependence - 305.10

- plan: continue medications; avoid all types of substances; maintain individual therapy

Pharmacologic Management 6/20/05
- subjective: feelings of depression, anxiety, frustration, irritability; overall family stressors; one pack of cigarettes daily; reported no use of alcohol, drugs, and other substances
- objective: slightly downcast/anxious; no signs of agitation/combativeness or abnormal thoughts; affect was appropriately frustrated; no suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or paranoia
- assessment:
	- recurrent major depression, severe without psychotic features 296.33
	- PTSD - 309.81
	- eating disorder, NOS 307.50
	- alcohol dependence - 303.90; in early remission
	- nicotine dependence - 305.10
- plan: continue all medications; attend individual counseling

Pharmacologic Management 10/4/05
- subjective: experiencing anxiety, racing thoughts, and panicky symptoms; continues to smoke one pack of cigarettes daily; reports no use of alcohol, drugs, and other substances
- objective: slightly anxious; no signs of agitation/combativeness or abnormal movements; appropriate affect; no suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or paranoia
- assessment:
	- recurrent major depression, severe without psychotic features 296.33
	- PTSD - 309.81
	- eating disorder, NOS 307.50
	- alcohol dependence - 303.90; in early remission
	- nicotine dependence - 305.10
- plan: continue medications; remain abstinence from alcohol; focus on smoking cessation

Pharmacological Management 1/4/06
- subjective: recheck and refill medications; no complaints
- objective: stable mood; no depressive features or symptoms; no psychotic features; no auditory or visual hallucinations; no suicidal or homicidal ideations
- assessment:
	- recurrent major depression 296.33
	- PTSD 309.81
	- alcohol dependence in remission 303.90

Pharmacologic Management 3/1/06
- subjective: no complaints; refill medications
- objective: stable mood; no depressive features or symptoms; no psychotic features; no auditory or visual hallucinations; no suicidal or homicidal ideations
- assessment:

        - recurrent major depression 296.33
        - PTSD 309.81
- plan: continue medications

Updated Brief Psychiatric Diagnostic Interview Examination 3/15/06
- chief complaint: doing better; wants back on Seroquel
- mental status examination: no signs of agitation/combativeness, frustration, irritability; alert and oriented in all spheres; speech was of normal rate/volume; mood was dysthymic/slightly anxious; affect was appropriately frustrated; thought content consistent with PTSD symptoms, depression, and anxiety; some mood swings/irritability; difficulty completing tasks; poor concentration/attention; no suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or any specific paranoia; judgment intact for standard questioning; insight was fair
- impression:

| | | |
|---|---|---|
| - Axis I | recurrent major depression, severe, without psychotic features - 296.33 |
| | PTSD - 309.81 |
| | Eating disorder, NOS - 307.50 |
| | Alcohol dependence, in full remission - 303.90 |
| | Nicotine dependence - 305.1 |
| - Axis II | none |
| - Axis III | hypertension, hiatal hernia, GERD, osteoarthritis, and migraines |
| - Axis IV | previous history of sexual/physical abuse, past family conflicts, previous financial stressors, previous problems in the occupational/social environment and ongoing psychiatric symptoms |
| - Axis V | GAF - 32 |

- plan: continue medications

Integrated Assessment Summary 4/21/06
- mental status: affect was appropriate; mood was okay; memory was intact; oriented times four; denies hallucinations, delusions, paranoia, suicidal or homicidal ideations
- identified problems: depression, anxiety, mood swings, irritability, insomnia
- current diagnosis:

| | |
|---|---|
| - Axis I (primary) | 296.33 major depression |
| - Axis I (secondary) | 309.81 PTSD |
| - Axis II | V71.09 no diagnosis |
| - Axis III | Z03.2  no diagnosis |
| - Axis IV | 4 |
| - Axis V | GAF - 61 |

Pharmacological Management 6/5/06
- subjective: difficulties with insomnia, racing thoughts, anxiety attacks, and occasional frustrations/irritability; has not used alcohol since New Year's Eve; has various PTSD symptoms; considering quitting smoking
- objective: pleasant/cooperative; appeared to be in no distress; no tics, twitches, stereotypies or signs of EPS/Tardive Dyskinesia; mood slightly anxious/dysthymic; appropriate affect; no signs of agitation/combativeness; thought content negative for suicidal/homicidal ideations, auditory/visual hallucinations, delusions, or any paranoia
- assessment

- recurrent major depression, severe, without psychotic features - 296.33
　　　　- PTSD - 309.81
　　　　- Eating disorder, NOS - 307.50
　　　　- Alcohol dependence, in full remission - 303.90
　　　　- Nicotine dependence - 305.1
- plan: increase Seroquel; continue other medications as written; recommended individual therapy, but claimant is reluctant

<u>Pharmacological Management 9/5/06</u>
- subjective: has anxiety, racing thoughts, mood swings, initial/middle insomnia and overall PTSD; decreased appetite; no other new difficulties or problems
- objective: pleasant/cooperative; no abnormal movements or any signs of EPS/Tardive Dyskinesia; mood slightly anxious and distractible; affect was appropriately frustrated; not tearful or angry; no suicidal or homicidal ideations, auditory and visual hallucinations, delusions, or any paranoia
- assessment:
　　　　- recurrent major depression, severe, without psychotic features - 296.33
　　　　- PTSD - 309.81
　　　　- Eating disorder, NOS - 307.50
　　　　- Alcohol dependence, in sustained full remission - 303.90
　　　　- Nicotine dependence - 305.1
- plan: increase Seroquel; maintain other prescriptions; recommend individual therapy

<u>12/28/06</u>
- subjective: ongoing mood swings, irritability, frustration, depression; medications not working; diarrhea; poor appetite; still uses cigarettes
- objective: pleasant/cooperative; no signs of agitationi/combativeness or EPS/Tardive Dyskinesia; mood slightly downcast/frustrated; affect was appropriate; not crying or tearful; no reported suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or paranoia; PTSD
- assessment:
　　　　- recurrent major depression, severe, without psychotic features - 296.33
　　　　- PTSD - 309.81
　　　　- Eating disorder, NOS - 307.50
　　　　- Alcohol dependence, in sustained full remission - 303.90
　　　　- Nicotine dependence - 305.1
- plan: increase Seroquel; continue other medications; recommend consistent counseling and working on various behavioral strategies

<u>Pharmacological Management 3/27/07</u>
- subjective: leg cramps and stiffness on regular basis; difficulties falling asleep; no worsening mood swings; experiencing irritability and depressive symptoms/anxiety; dealing with self-starvation and occasional purging episodes; one pack of cigarettes daily; not using alcohol or other substances
- objective: pleasant/cooperative; no signs of agitation/combativeness; no signs of EPS/Tardive Dyskinesia; mood was dysthymic/anxious; affect was appropriately frustrated; not crying or tearful; no reported suicidal or homicidal ideations, auditory or visual hallucinations, delusions,

or paranoia
- assessment:
- recurrent major depression, severe, without psychotic features - 296.33
- PTSD - 309.81
- Eating disorder, NOS - 307.50
- Alcohol dependence, in sustained full remission - 303.90
- Nicotine dependence - 305.1
- plan: start Benxtropine; continue all other medications; recommend consistent counseling and working on various behavioral strategies; patient remains reluctant to attend counseling

<u>6/26/07</u>
- subjective: came for prescriptions; very agitated; cries easily
- objective: very emotional and upset
- assessment:
- recurrent major depression, severe, without psychotic features - 296.33
- PTSD - 309.81
- Eating disorder, NOS - 307.50
- plan: maintain Lexapro, Seroquel, and illegible

<u>8/7/07</u>
- subjective: difficulties with anxiety, irritability, mood swings, racing thoughts, and anxiety/panic symptoms; maintaining medications; no further episodes of purging or any other hazardous weight loss practices; smokes one pack of cigarettes daily; refraining from alcohol and other substances
- objective: pleasant/cooperative; no signs of agitation/combativeness or EPS/Tardive Dyskinesia; mood slightly anxious/dysthymic; affect appropriate; not crying or tearful; no reported suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or any paranoia
- assessment:
- recurrent major depression, severe, without psychotic features - 296.33
- PTSD - 309.81
- Eating disorder, NOS - 307.50
- Alcohol dependence, in sustained full remission - 303.90
- Nicotine dependence - 305.1
- plan: increase Seroquel; recommend increasing Vistaril; continue all other medications as written; highly recommend therapy, but claimant remains reluctant

<u>11/7/07</u>
- subjective: remains on Seroquel; anxiety and frustration; chronic pain; attending family therapy; smokes one pack of cigarettes daily; no use of other substances
- objective: pleasant/cooperative; no signs of agitation or combativeness; no signs of EPS or Tardive Dyskinesia; mood slightly dysthymic; affect was appropriate; not crying or tearful; no reported suicidal or homicidal ideations, auditory or visual hallucinations, delusions, or paranoia
- assessment:
- recurrent major depression, severe, without psychotic features - 296.33
- PTSD - 309.81
- Eating disorder, NOS - 307.50

       - Alcohol dependence, in sustained full remission - 303.90

       - Nicotine dependence - 305.1

- plan: continue Seroquel; start Cymbalta for anxiety, depression and pain symptoms; maintain consistent counseling

9/2/08

- subjective: off medications because of side effects; chronic pain; depression, anxiety, and PTSD symptoms; smokes one pack of cigarettes daily; not using other substances

- objective: pleasant/cooperative; slightly downcast, anxious, and frustrated; affect was appropriate; no reported suicidal or homicidal ideations, auditory or visual hallucinations, delusions or paranoia

- assessment:

       - recurrent major depression, severe, without psychotic features - 296.33

       - PTSD - 309.81

       - Eating disorder, NOS - 307.50

       - Alcohol dependence, in sustained full remission - 303.90

       - Nicotine dependence - 305.1

- plan: claimant agreed to resume antidepressant; recommend consistent individual therapy and working on various behavioral strategies


**Emergency Department Records, Davis Memorial Hospital, 4/18/04 (Tr. 178-82)**

- chief complaint: animal bite to right hand; pain in right wrist from falling off porch after bite

- clinical impression: animal bite to right hand

- x-ray results: bony mineralization is normal; no traumatic or destructive lesions seen; joint spaces and articular surfaces are well-preserved; no soft tissue abnormalities found – negative exam


**Emergency Department Records, Davis Memorial Hospital, 4/21/04 (Tr. 183-86)**

- chief complaint: injury to right wrist

- clinical impression: right wrist sprain


**Hospital Records, United Hospital Center, Dr. Guy, 6/25/04-6/29/04 (Tr. 189-98)**

Admission:

- chief complaint: presented to Appalachian Mental Health Center for request for alcohol detox and help with depressive/mood symptoms; describes feeling depressed most days - lack of energy, fatigue, poor concentration, occasional crying, easily agitated, very irritable, suicidal thoughts on occasion

- review of systems: positive for some general arthritic pain; some recent self-induced vomiting for weight loss;

- mental status exam: clean, poorly groomed, occasionally dressed; cooperative and appropriate; fair eye contact; speech spontaneous, slightly pressured, goal directed, appropriate content; mood and affect mildly depressed; increased mood lability; denied harmful or psychotic thoughts; no difficulty with sleep or appetite; alert and oriented times three; memory intact and unimpaired; intellect average

- assessment:
        - Axis I: mood disorder, not otherwise specified - 296.90
                Alcohol dependence - 305.90
                Nicotine dependence - 305.1
                Marijuana dependence - 305.20
        - Axis II: rule out personality disorder, not otherwise specified 301.9
        - Axis III: arthritis, asthma
        - Axis IV: problems with primary support; problems with antisocial environment; psychosocial stressors - severe, economic problems, employment problems, housing problems, relationship problems, addiction problems
        - Axis V: GAF current 45
- Plan: regular admission to Dr. Guy's service; medications; started on alcohol withdraw protocol

Discharge
- discharge principal diagnosis:
        - Axis I: mood disorder, not otherwise specified - 296.90
                Alcohol dependence - 305.90
                Nicotine dependence - 305.1
                Marijuana dependence - 305.20
        - Axis II: rule out personality disorder, not otherwise specified 301.9
        - Axis III: arthritis, asthma
        - Axis IV: problems with primary support; problems with antisocial environment; psychosocial stressors - severe, economic problems, employment problems, housing problems, relationship problems, addiction problems
        - Axis V: GAF on admission 45, current 55
- discharge instructions: follow-up at Appalachian Mental Health center for intake and intensive outpatient therapy; follow-up with family doctor for hypertension
- diagnostic data at discharge: complete blood count within normal limits; alcohol level negative; toxicology screen negative; thyroid normal

**Emergency Department Records, Davis Memorial Hospital, 9/4/04 (Tr. 199-203)**
- chief complaint: injury to left ankle; unable to bear weight
- clinical impression: left ankle sprain
- x-ray: no acute bony abnormality

**Psychiatric Review Technique, Robert Marivelli, 11/24/04 (Tr. 204-17)**
Medical Summary
- medical disposition: impairment severe but not expected to last 12 months
- categories upon which the medical disposition is based:
        - 12.04 affective disorders: medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above - MDD
        - 12.06 anxiety-related disorders: medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above - TSD
        - 12.07 somatoform disorders: medically determinable impairment is present that does

not precisely satisfy the diagnostic criteria above: eating disorder

<u>Rating of Functional Limitations</u>
- restriction of activities of daily living: mild
- difficulties in maintaining social functioning: mild
- difficulties in maintaining concentration, persistence, or pace: mild
- episodes of decompensation, each of extended duration: none

<u>Notes</u>
- credible


**<u>Internal Medicine Examination, Tri-State Occupational Medicine, Dr. Beard, 12/1/04 (Tr. 218-26)</u>**
- chief complaint: hypertension, COPD, migraines, joint pain
- general exam: no ambulatory aids or assistive devices; ambulates normally; able to stand unassisted; comfortable seated and supine; able to speak understandably and follow instructions without difficulty
- neurologic exam: no evidence of weakness on manual muscle testing; sensation appears intact; able to heel walk, toe walk, tandem walk and squat
- impression: COPD, hypertension, chronic arthralgias, chronic headaches
- summary: history of shortness of breath, chronic cough and weezing; pulmonary function is interpreted as mild COPD; lungs are clear to auscultatioin without exertional dyspnea; no end-organ damage related to hypertension; no evidence of inflammatory arthritis in regard to chronic joint pain; ranges of motion are preserved; neurologic exam is unremarkable with regard to headaches


**<u>Physical Residual Functional Capacity Assessment, Dr. Reuder (sp), 12/27/04 (Tr. 227-34)</u>**
<u>Exertional Limitations</u>
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull: unlimited
<u>Postural Limitations</u>: none
<u>Manipulative Limitations</u>: none
<u>Visual Limitations</u>: none
<u>Communicative Limitations</u>: none
<u>Environmental Limitations</u>:
- extreme cold: unlimited
- extreme heat: unlimited
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: avoid concentrated exposure
- hazards: unlimited

<u>Comments</u>: appears partially credible

**<u>Physical Therapy Evaluation, Elkins Physical Therapy, Dr. Roberts, 2/7/05 - 6/10/05 (Tr. 240-52)</u>**

<u>2/7/05 Evaluation</u>
- subjective: back pain
- assessment/plan: present with chronic low back pain and reports bulging disks detected on recent diagnostic tests; plan is to decrease pain and increase tolerance to activities of daily living
<u>2/7/05</u>
- subjective: back pain; depression, GERD, migraines, panic/anxiety attacks
<u>2/9/05</u>: cancelled
<u>2/14/05</u>: no show
<u>2/17/05</u>
- subjective: continued low back pain
- assessment: stretches well
<u>2/22/05</u>: no show
<u>2/24/05</u>
- subjective: pain eased slightly overall
- assessment: slowly increasing tolerance to activity
<u>3/1/05</u>
- subjective: continued low back pain
<u>3/4/05</u>
- subjective: back and legs sore; overall fatigue
- assessment: poor tolerance to exercise
<u>3/7/05</u>: cancelled
<u>3/9/05</u>
- subjective: continued bilateral lumbar pain - slightly greater on left side today
- assessment: slowly increasing tolerance to ADLs and lifting
<u>3/11/05</u>
- subjective: been in pain
- assessment: complained of pain during exercise
<u>3/14/05</u>
- subjective: doing fairly well today; still has some continued left pain (B) side
- assessment: slowly increasing tolerance to lifting
<u>3/16/05</u>
- subjective: back feeling fairly good; some stiffness
- assessment: less frequent complaints of pain
<u>3/18/05</u>
- subjective: back feeling better overall recently; more tolerant of day to day activities
- assessment: continues to slowly improve
<u>3/ /05</u>: cancelled
<u>3/25/05</u>: cancelled
<u>3/28/05</u>
- subjective: some continued soreness from light lifting and ADLs at home; pain across low back

- assessment: no significant complaints of pain during exercise
3/31/05: cancelled
4/8/05
- subjective: increasing pain following any type of heavier lifting
- assessment: continues to increase tolerance to exercise
4/15/05
- subjective: tingling and burning down both legs - difficult to walk
- assessment: good tolerance to activity despite pain
4/18/05: no show
4/20/05
- subjective: doing fairly well overall; some recent increase in pain, which makes it difficult to sleep
- assessment: complained of pain during all exercises
4/21/05
- subjective: back better overall but still some pain in some ADLs
- assessment: still has sacral pain
4/26/05
- subjective: increase pain in knees and back

- assessment: increase overall pain today
4/29/05: no show
5/9/05
- subjective: still complains of low back pain and more recently knee pain
- assessment: tolerance to exercises (illegible)
5/13/05: cancelled
5/16/05: cancelled
5/25/05
- subjective: x-rays performed on knee; back doing fairly well
- assessment: back pain remains about the same; good tolerance to exercise
5/27/05
- subjective: back doing fairly well
- assessment: tolerates all activity
5/31/05
- subjective: back doing fairly well recently
- assessment: more tolerant of exercise and activity
6/3/05: cancelled
6/6/05
- subjective: some pain both sides (illegible)
- assessment: good tolerance to exercise despite initial complaints of pain
6/ /05: cancelled
6/10/05
- subjective: pain increased
- assessment: stark working on more aggressive strengthening of back

**Neurological Evaluation, University Health Associates, Drs. McFadden and Boling, 5/23/05 (Tr. 253-58)**
- chief complaint: headaches - hit head in car accident
- review of symptoms: high blood pressure; headache; COPD; acid reflux; back and leg pains; PMSC, desp. anx.; nerves
- presented with primary complaints of headaches in vertex region of skull and scalp, described dysesthesias of her scalp as well as into right hand and right arm. Afebrile upon examination; fundi appear to be flat; no evidence of papilledema; peripheral pulses are intact; gait appeared to be without signs of apraxia; oriented times 3; memory and concentration appear normal; cranial nerves are all normal

**Physical Residual Functional Capacity Assessment, Dr. Osborne, 7/15/05 (Tr. 303-10)**
- primary diagnosis: headaches
- secondary diagnosis: mild COPD
- other alleged impairments: arthritis
Exertional Limitations
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull: unlimited, other than as shown for lift and/or carry
Postural Limitations
- climbing ramp/stairs: frequently
- climbing ladder/rope/scaffolds: never
- balancing: frequently
- stooping: frequently
- kneeling: frequently
- crouching: frequently
- crawling: frequently
Manipulative Limitations: none
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations
- extreme cold: avoid concentrated exposure
- extreme heat: unlimited
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid concentrated exposure

**Treatment Notes, Davis Memorial Hospital, 8/2/05 - 9/1/05 (Tr. 389-94)**
8/2/05

- complaint: lower back pain
- review of systems: tiredness and poor appetite; difficulty sleeping; shortness of breath; coughing, wheezing, and breathing difficulty; has chronic obstructive pulmonary disease; back and joint pain; headaches; no visual difficulty
- impression:
    - multiple pain complaints - lower back, bilateral knee, and bilateral ankle
    - degenerative disc disease of lumbar spine at L4-5
    - left sacroiliac joint disease
    - bilateral piriformis muscle syndrome
    - bilateral trochanteric bursitis
    - hypertension
    - asthma and chronic obstructive pulmonary disease
    - headaches
    - history of seizure disorder
    - depression and anxiety
- plan: scheduled for follow-up procedures; continue with physical therapy; continue current medications
9/1/05
- impression:
    - multiple pain complaints - lower back, bilateral knee, and bilateral ankle
    - degenerative disc disease of lumbar spine at L4-5
    - left sacroiliac joint disease
    - bilateral piriformis muscle syndrome
    - bilateral trochanteric bursitis
    - hypertension
    - asthma and chronic obstructive pulmonary disease
    - headaches
    - history of seizure disorder
    - depression and anxiety
- plan: continue scheduled injections; continue current medications; continue physical therapy; follow-up for knee pain

**Emergency Record, Davis Memorial Hospital, 8/6/05 (Tr. 311-315)**
- chief complaint: injured low back - can't stand
- physical exam:
    - back – decreased ROM, muscle spasm, CVA tenderness, vertebral point-tenderness
- clinical impression: acute myofascial strain - lumbar; acute low back pain

**Medical Report, Dr. Pavlovich, 8/23/05 (Tr. 370)**
- objective: referred for evaluation of bilateral knee and ankle pain; ROM of 0-130 degrees bilaterally; pain on patellofemoral grind testing; no medial or lateral joint line pain in knee; mildly tender over her left and right ankle joint surface
- x-ray results: no evidence of radiopathology in ankle; degenerative changes consistent with mild osteoarthritis in knees

- assessment: Cortisone injection in left knee; if pain persists - possibly another injection

**Medical Records, Dr. Henderson, 8/26/05-12/15/08 (Tr. 420-28 & 941-45 & 973-81)**
8/26/05
- chief complaint: chronic constipation
- plan: medication
9/9/05
- chief complaint: pelvic pain that keeps getting worse; big toe on right foot infected
- plan: illegible
9/24/05 CAT scan-head w/o contrast
- impression: essentially unremarkable CT of the brain
10/3/05
- chief complaint: flu; headache; all over pain; blurred vision; dry mouth
- plan: headaches; illegible
10/29/05
- chief complaint: headaches; all over pain; blurred vision; dry mouth
- plan: illegible
4/12/07
- chief complaint: coughing thick, green mucus
- assessment/plan: bronchitis - illegible
6/28/07
- chief complaint: chronic back pain
- assessment/plan: chronic back pain - Darvocet
7/20/07
- chief complaint: panic attacks, hurting from knees down and elbows down to her hands
- assessment/plan: panic - continue current medications; add new; chronic pain
8/17/07
- chief complaint: panic attacks, chronic pain; nervous; getting weak, shaky, lightheaded; no energy
- assessment/plan: chronic back pain - vicodin; anxiety - continue to follow
9/17/07
- chief complaint: chronic back pain; anxiety
- assessment/plan: chronic back pain - vicodin; anxiety - illegible
11/12/07
- chief complaint: cough, chest congestion
- assessment/plan: bronchitis - stop smoking; prescriptions; chronic back pain - illegible; migraine headaches - illegible
3/13/08
- chief complaint: 2 toes swollen on both feet; right wrist hurting when she picks up stuff; right foot hurting when she steps down on it
- assessment/plan: foot pain - illegible; wrist pain - x-ray
4/14/08
- chief complaint: anxiety/ chronic pain; migraines
- assessment/plan: foot pain - illegible; chronic back pain - vicodin; illegible; GERD

7/14/08
- chief complaint: anxiety; chronic back pain
- assessment/plan: chronic back pain - vicodin; anxiety - okay; asthma - stable; GERD - continue medications
9/10/08
- chief complaint: chronic back pain; anxiety; asthma; GERD; HTN
- assessment/plan: chronic back pain - vicodin; GERD - stable; HTN - good
10/13/08
- chief complaint: chronic back pain; HTN, GERD
- assessment/plan: headaches; chronic back pain - vicodin
11/3/08
- chief complaint: headaches; joint pain - knees and hands; ear pain
- assessment/plan: chronic pain - illegible; illegible
11/14/08
- chief complaint: anxiety; chronic back pain
- assessment/plan: chronic back pain - vicodin; migraines; anxiety
12/15/08
- chief complaint: check up
- assessment/plan: chronic back pain - vicodin


**Psychiatric Review Technique, Joseph Kuzniar, 8/29/05 (Tr. 371-84)**
Medical Summary
- medical dispositions: RFC Assessment necessary
- categories upon which medical disposition is based:
    - 12.04 affective disorders - medically determinable impairment present that does not precisely satisfy the diagnostic criteria above - major depression
    - 12.06 anxiety-related disorders - medically determinable impairment present that does not precisely satisfy the diagnostic criteria above - PTSD
    - 12.07 somatoform disorders - medically determinable impairment present that does not precisely satisfy the diagnostic criteria above - eating disorder
    - 12.09 substance addiction disorders - medically determinable impairment present that does not precisely satisfy the diagnostic criteria above - ERON dependency
Rating of Functional Limitations
- restriction of activities of daily living: mild
- difficulties in maintaining social functioning: moderate
- difficulties in maintaining concentration, persistence, or pace: mild
- episodes of decompensation, each of extended duration: none


**Mental Residual Functional Capacity Assessment, Joseph Kuzniar, 8/29/05 (Tr. 385-88)**
Understanding and Memory
- ability to remember locations and work-like procedures: not significantly limited
- ability to understand and remember very short and simple instructions: no evidence of limitation
- ability to understand and remember detailed instructions: not significantly limited

Sustained Concentration and Persistence
- ability to carry out very short and simple instructions: no evidence of limitation
- ability to carry out detailed instructions: not significantly limited
- ability to maintain attention and concentration for extended periods: not significantly limited
- ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances: moderately limited
- ability to sustain an ordinary routine without special supervision: no evidence of limitation
- ability to work in coordination with or proximity to others without being distracted by them: moderately limited
- ability to make simple work-related decisions: no evidence of limitation
- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited
Social Interaction
- ability to interact appropriately with general public: not significantly limited
- ability to ask simple questions or request assistance: no evidence of limitation
- ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
- ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: moderately limited
- ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited
Adaption
- ability to respond appropriately to changes in the work setting: not significantly limited
- ability to be aware of normal hazards and take appropriate precautions: no evidence of limitation
- ability to travel in unfamiliar places or use public transportation: no evidence of limitation
- ability to set realistic goals or make plans independently of others: not significantly limited

**Letter, Dr. Brick, University Health Associates, 9/7/05 (Tr. 496-98)**
- reviewed MRI scan - still has some ventriculomegaly, unchanged from previous examinations
- impression: daily headaches; ventriculomegaly
- may want to consider botox injections for her scalp - may help headaches

**Emergency Record, Davis Memorial Hospital, 9/10/05 (Tr. 395-98)**
- chief complaint: headache with nausea, vomiting, and dizziness
- clinical impression: headache - muscle tension

**Emergency Record, Davis Memorial Hospital, 9/24/05 (Tr. 399-405)**
- chief complaint: headaches come and go
- clinical impression: hypokalemia
- CAT scan-head w/o contrast
        - impression: essentially unremarkable CT of the brain

**Mental Impairment Questionnaire, Dr. Chandron 10/4/05 (Tr. 406-09)**
- DSM-IV Multiaxial Evaluation:
    - Axis I: recurrent MDD, severe
    - Axis II: PTSD, eating disorder, ETOH dependence
    - Axis III: HTN, GERD, migraine headaches, osteoarthritis
    - Axis IV: history of abuse, financial stressors, problems in social environment
    - Axis V: Current GAF - 55%; highest GAF past year - 61%
- treatment and response: meds/targeted case management - fair response; individual therapy recommended
- side effects: sedation; grogginess; dizziness
- clinical findings: poor concentration/attention; difficulty with recent memory; affect is frustrated; mood is downcast and anxious; depression
- prognosis: poor - chronic condition
- functional limitations:
    - restriction of activities of daily living: moderate
    - difficulties in maintaining social functioning: marked
    - deficiencies of concentration, persistence, or pace: marked
    - repeated episodes of decompensation within 12 month period, each of at least two weeks duration: four or more

**Emergency Record, Davis Memorial Hospital, 10/9/05 (Tr. 410-13)**
- chief complaint: chronic back pain - sharp
- clinical impression: chronic low back pain

**Emergency Record, Davis Memorial Hospital, 10/26/05 (Tr. 414-19)**
- chief complaint: headache - moderate
- clinical impression: headache - migraine
- CT scan head w/o contrast:
    - impression: essentially negative CT of the head without significant interval change

**Medical Records & Progress Notes, Dr. Rahman, 11/14/05-10/8/07 (Tr. 550-60 & 564-65 & 872-79 & 986-89)**
<u>11/14/05</u>
- chief complaint: chronic headache
- review of systems: complains of seeing flashing lights, dryness of mouth, shortness of breath, cough, sputum, wheezing, high blood pressure, cramping in legs, heartburn, change in appetite, trouble with urinating, muscle weakness, depression, crying spells, and being nervous
- assessment and plan: headache history is suggestive of migraine headache mixed with tension headache and chronic daily headache probably analgesic; continue current medications; start Topamax
<u>1/16/06</u>

- chief complaint: chronic headache
- impression/ plan: chronic headache - increase medication; anxiety, depression, bipolar disorder, panic - continue medication; HTN - stable

3/20/06
- chief complaint: chronic headache
- impression/plan:
    - chronic headaches/migraines - increase medication
    - anxiety, depression, bipolar - continue medication
    - PTSD - stable
    - HTN - stable
    - GERD

5/22/06
- chief complaint: headache; not as bad as before
- impression/plan:
    - migraine - tension headaches - increase dosage
    - anxiety, depression, bipolar disorder - stable
    - HTN - stable
    - GERD - stable

8/25/06
- chief complaint: headache; skin rash
- other medical problems:  depression, bipolar, PTSD, COPD, HTN, GERD, fibromyalgia
- impression/plan:
    - headache/migraines - try new medication
    - anxiety, depression, bipolar, PTSD, - stable on Seroquel/Lexapro
    - HTN - stable
    - GERD - stable

1027/06
- chief complaint: headache
- other medical issues: anxiety, depression, bipolar, PTSD, COPD, HTN, GERD; denies use of alcohol
- impression/plan:
    - migraines - increase medications
    - anxiety, depression - stable on Seroquel/Lexapro
    - HTN - stable
    - GERD - stable

3/19/07
- chief complaint: headache
- other medical conditions: depression, bipolar, PTSD, COPD, HTN; denies alcohol
- impression/plan:
    - migraine - increase medication
    - depression - stable; continue Lexapro
    - HTN - stable

5/21/07
- chief complaint: headache

- other medical conditions:  depression, bipolar, PTSD, COPD, HTN; denies alcohol
- impression/plan:
      - migraines - almost everyday, chronic daily headache - add new medication
      - anxiety, depression - stable on Lexapro
      - HTN - stable - continue medication
      - GERD - stable

<u>7/23/07</u>
- chief complaint: headaches
- other medical conditions: anxiety, depression, bipolar, PTSD; COPD; HTN; GERD; denies alcohol use
- impression/plan:
      - anxiety, depression, bipolar - on Lexapro - see psychiatrist
      - migraines - increase medications
      - HTN - stable on Diovan
      - GERD - stable

<u>10/8/07</u>
- chief complaint: headache
- other medical conditions:  anxiety, depression, bipolar, PTSD; COPD; HTN; GERD; denies alcohol use
- impression/plan:
      - migraines and tension headaches - illegible
      - anxiety, depression - stable on Lexapro
      - HTN - stable on Diovan
      - GERD - stable


**Emergency Record, Davis Memorial Hospital, 12/5/05 (Tr. 455-59)**
- chief complaint: chronic back pain
- clinical impression: low back pain


**Emergency Records, Davis Memorial Hospital, 12/8/05 (Tr. 460-73)**
- chief complaint: onset numbness
- clinical impression: hypokalemia
- CT scan - head w/o contrast
      - clinical history: rule out bleed
      - impression: normal unenhanced CT of the brain
- chest, single view
      - impression: normal chest exam


**Medical Records, Dr. Henderson, 12/8/05-9/12/07 (Tr. 448-54 & 562-63 & 566-76 & 880-95)**
<u>1/16/06</u>
- chief complaint: flu myalgia; hands and feet swelling; legs hurting
- assessment/plan: illegible
<u>1/28/06</u>
- chief complaint: urine hesitancy and earache in right ear

- assessment/plan: illegible
5/11/06
- chief complaint: constipation
- assessment/plan: increase fiber; illegible
8/10/06
- chief complaint: HTN; constipation; vomiting; nausea
- assessment/plan: HTN; chronic low back pain
9/25/06
- chief complaint: back pain
- subjective: still has back pain; MRI done
- assessment/plan: low back pain - MRI; HTN - okay; illegible
11/9/06
- chief complaint: HTN, back pain
- assessment/plan: chronic back pain - Darvocet; HTN - good
11/27/06
- chief complaint: diarrhea; aches; pains; lightheadedness
- assessment/plan: diarrhea
12/8/06
- chief complaint: still having diarrhea
- assessment/plan: kypokalemia
9/12/07
- chief complaint: coughing; thick green mucus
- assessment/plan: bronchitis

**Emergency Records, Davis Memorial Hospital, 1/12/06 (Tr. 474-78)**
- chief complaint: skin rash
- clinical impression: drug rash

**Medical Records, UHC Rheumatology & Osteoporosis Clinic, 2/13/06-3/2/06 (Tr. 500-17)**
- neurological examination: good strength in all extremities; reflexes are normal; no neurological deficits
- musculoskeletal examination: tenderness in upper trapezius muscles, thoracic spine, paraspinous muscles, SI joint regions, both trochanteric regions, medial anterior regions of knees
- impression: chronic pain syndrome; has several tender points; meets criteria for fibromyalgia; exclude an underlying connective tissue disease or inflammatory arthritis
- recommendation: update lab work; keep on current medications

**Emergency Department Records, Davis Memorial Hospital, 8/3/06 (Tr. 518-30)**
- chief complaint: headache; increase blood pressure; blurred vision; nausea; vomiting
- clinical impression: headache; HTN
- CT head w/o contrast impression: normal unenhanced CT of the brain

**Emergency Department Records, Davis Memorial Hospital, 8/3/06 (Tr. 858-63)**
- triage note: headache; weakness; blurred vision; nausea; seen here this morning for same

complaint
- clinical impression: headache; (illegible) to hypertension

**Emergency Department Records, Davis Memorial Hospital, 8/10/06 (Tr. 531-39 & 841-49)**
- chief complaint: headache; vomiting; increased blood pressure
- triage note: blood pressure up; vomiting; head hurts; sharp pains left temple
- clinical impression: headache; hypokalemia
- CT head w/o contrast
  - clinical history: headache
  - impression: normal unenhanced CT of the brain

**Emergency Department Records, Davis Memorial Hospital, 8/22/06 (Tr. 540-46)**
- chief complaint: back pain; neck pain
- clinical history: acute & chronic low back pain; probably acute strain

**Emergency Department Records, Davis Memorial Hospital, 8/23/06 (Tr. 547-49)**
- chief complaint: chronic low back pain; foot numbness

**MRI Results, Davis Memorial Hospital, Dr. Hendersen, 9/8/06 (Tr. 561)**
- clinical history: chronic low back pain
- impression: no abnormality identified in lumbar spine

**Emergency Department Records, Davis Memorial Hospital, 12/27/06 (Tr. 827-29)**
- chief complaint: bad headache

**Mental Status Examination, Sharon Joseph, Ph.D., 9/25/07 (Tr. 899-902)**
- chief complaint: hypertension, panic attacks, depression, PTSD, COPD, arthritis, fibromyalgia
- substance abuse history: reported had a problem with alcohol in past; has not drank alcohol since New Year's Eve 2006; denies ever having used illegal drugs
- mental status examination: alert, oriented x3, and cooperative; reports difficulty with ambulation; denies appetite disturbance; trouble sleeping; mood appears depressed; admits to suicidal ideation without intent or plan; denies homicidal ideation; no perceptual or thinking disturbances relative to presence of hallucinations or delusions; no preoccupations, obsessions, or compulsions; motor activity is nervous; posture is appropriate; average eye contact; average language usage; normal speaking speed; content is relevant; affective expression is anxious; insight and judgment appear fair
- concentration: appears moderately impaired
- memory: immediate memory - normal; recent - moderately impaired; remote - normal
- judgment: within normal limits
- diagnostic impression:
  - Axis I   major depression, recurrent moderate; panic disorder without agoraphobia
  - Axis II   deferred
  - Axis III   multiple medical problems
- diagnostic rationale: reports symptoms consistent with major depression; does not currently

describe sufficient criteria for PTSD; no medical records to confirm therapist diagnosed her with PTSD
- prognosis: psychological - fair
- capability: appears capable of managing her benefits

**Internal Medicine Examination, Tri-State Occupational Medicine, Inc., 10/3/07 (Tr. 903-13)**
- chief complaint: COPD, hypertension, fibromyalgia, and low back and joint pain
- past medical history: history of COPD, hypertension, depression/PTSD, fibromyalgia
- subjective: shortness of breath, coughing, and wheezing; pleuritic chest wall pain; nausea with headaches; headaches also accompanied with photophobia
- impression: tobacco use; history of COPD; hypertension appears controlled with current medication; chronic lumbosacral back pain with report of bulging disc on prior imaging studies but imaging study reports were not available for review; cervical strain with possible degenerative changes of the cervical spine; history of fibromyalgia with arthralgias of the hands, wrists, elbows, knees, ankles, and feet; range of motion of joints in the extremities remains normal; report of decreased sensation over right upper and right lower extremities as well as diffuse tenderness over the distal right leg did not show any dermatomal or peripheral nerve pattern.
- summary: may have limitation with prolonged or heavy exertion with smoking history but currently pulmonary exam appeared normal; standing, walking, bending, and carrying appeared limited due to chronic low back pain as well as knee and distal lower extremity pain

**Psychiatric Review Technique, Joseph Shaver, Ph.D, 10/4/07 (Tr. 914-27)**
Medical Summary
- medical disposition: RFC assessment necessary
- categories upon which the medical disposition is based:
        - 12.04 affective disorders - a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: major depression, recurrent, moderate
        - 12.06 anxiety-related disorders - recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress
Functional Limitations
- restriction of activities of daily living: mild
- difficulties in maintaining social functioning: none
- difficulties in maintaining concentration, persistence, or pace: moderate
- episodes of decompensation, each of extended duration: none

**Mental Residual Functional Capacity Assessment, Joseph Shaver, Ph.D, 10/4/07 (Tr. 928-31)**
Understanding and Memory
- ability to remember locations and work-like procedures: not significantly limited
- ability to understand and remember very short and simple instructions: not significantly limited
- ability to understand and remember detailed instructions: moderately limited
Sustained Concentration and Persistence

- ability to carry out very short and simple instructions: not significantly limited
- ability to carry out detailed instructions: moderately limited
- ability to maintain attention and concentration for extended periods: moderately limited
- ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances: moderately limited
- ability to sustain an ordinary routine without special supervision: not significantly limited
- ability to work in coordination with or proximity to others without being distracted by them: not significantly limited
- ability to make simple work-related decisions: not significantly limited
- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

Social Interaction
- ability to interact appropriately with the general public: not significantly limited
- ability to ask simple questions or request assistance: not significantly limited
- ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited
- ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaption
- ability to respond appropriately to changes in work setting: not significantly limited
- ability to be aware of normal hazards and take appropriate precautions: not significantly limited
- ability to travel in unfamiliar places or use public transportation: not significantly limited
- ability to set realistic goals or make plans independently of others: not significantly limited

Functional Capacity Assessment: appears generally credible regarding reported medical functioning; significant limitations in her ADLs seem to be secondary to her physical condition. Believed that Claimant retains the mental capacity to operate in routine, low stress, work situations that require only two- to-three-step operations


**Radiology Report, St. Joseph's Hospital of Buckhannon, 10/8/07 (Tr. 932)**
- chest PA and lat
- impression: normal PA and lateral chest films


**Physical Residual Functional Capacity Assessment, Christine Sias, 10/24/07 (Tr. 933-40)**
- primary diagnosis: chronic back pain
- secondary diagnosis: COPD; HTN

Exertional Limitations
- occasionally lift: 20 pounds
- frequently lift: 10 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull: unlimited, other than as shown for lift and/or carry

Postural Limitations
- climbing ramp/stairs: occasionally

- climbing ladder/rope/scaffolds: never
- balancing: occasionally
- stooping: occasionally
- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally

Manipulative Limitations: none

Visual Limitations: none

Communicative Limitations: none

Environmental Limitations
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: avoid concentrated exposure
- hazards: unlimited

additional comments: claimant appears partially credible; her complaints are somewhat excessive as compared to exam


**Mental Residual Functional Capacity Assessment, Philip Comer, Ph.D., 1/14/08 (Tr. 953-56)**

Understanding and Memory
- ability to remember locations and work-like procedures: not significantly limited
- ability to understand and remember very short and simple instructions: not significantly limited
- ability to understand and remember detailed instructions: moderately limited

Sustained Concentration and Persistence
- ability to carry out very short and simple instructions: not significantly limited
- ability to carry out detailed instructions: moderately limited
- ability to maintain attention and concentration for extended periods: moderately limited
- ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances: moderately limited
- ability to sustain an ordinary routine without special supervision: not significantly limited
- ability to work in coordination with or proximity to others without being distracted by them: moderately limited
- ability to make simple work-related decisions: not significantly limited
- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

Social Interaction
- ability to interact appropriately with the general public: not significantly limited
- ability to ask simple questions or request assistance: not significantly limited
- ability to accept instructions and respond appropriately to criticism from supervisors: no

evidence of limitation in this category
- ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited
Adaption
- ability to respond appropriately to changes in work setting: not significantly limited
- ability to be aware of normal hazards and take appropriate precautions: not significantly limited
- ability to travel in unfamiliar places or use public transportation: not significantly limited
- ability to set realistic goals or make plans independently of others: not significantly limited
Functional Capacity Assessment: Claimant's functional limitations do not call for a RFC allowance.  She appears to have the mental/emotional capacity for simple work related activity in a low stress/demand work environment that can accommodate her physical limitations

**Psychiatric Review Technique, Philip Comer, Ph.D., 1/14/08 (Tr. 957-70)**
Medical Summary
- medical disposition:
        - RFC Assessment Necessary
- categories upon which the medical disposition is based:
        - 12.04 affective disorders - a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above - MDD, REC, moderate
        - 12.06 anxiety-related disorders - recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week
Functional Limitation
- restriction of activities of daily living: mild
- difficulties in maintaining social functioning: mild
- difficulties in maintaining concentration, persistence, or pace: moderate
- episodes of decompensation, each of extended duration: none
Notes: statements are reasonably consistent with CE and are credible from her perspective

**Case Analysis, Dr. Franyutti, 1/14/08 (Tr. 971)**
- reviewed all medical evidence in file and assessment of 10/24/07 is affirmed as written

D.      Testimonial Evidence

        Testimony was taken at the hearing held on January 31, 2007.  The following portions of

the testimony are relevant to the disposition of the case:

        EXAMINATION OF CLAIMANT BY ATTORNEY:
        Q       Okay.  Tell me about your educational background?  How far did you go in school?
        A       Eighth grade.
        Q       Okay.  Have you attempted to get your GED at any point?
        A       Yeah.

Q        Okay.  Have you gotten that?

A        Yeah.

Q        Okay.  How long ago was it you got your GED?

A        I had - - just a minute - - '96, I think.

Q        Okay.  Any other type of education or training that you've gotten beyond high school, voc tech classes, anything like that?

A        No.

Q        All right.  Tell me about your work history?  What type of work have you done in the past?

A        Child care.

Q        Okay.  When was it that you last worked?

A        I'm not real sure on the date.

Q        Okay.  Do you have any estimate?

A        Okay.  I don't - - I can't even think what grade I am when Jessie was in school.  Jessie might have been in first, kindergarten.  She's 2 now.

Q        Well, let me tell you, you've alleged an onset date in this case of June the 11th, of 2003.  Does that sound about like the - -

A        Yeah.

Q        - - last time you worked?

A        Yeah.

Q        Okay.  Where was it that you were working at that time?

A        At my home.

Q        Okay.  You cared for children in your home?

A        Yeah.

Q        How many did you have?

A        I had my two and three others.

Q        Okay.  How were you paid for that work?

A        Oh, the State or West Virginia paid, Mountain Heart.

Q        All right.  Can you tell me, were you required to do any you know, lifting and thing of that nature in that job?

A        No.  The kids was all big enough to walk and I think the youngest was 4.

Q        Okay.  What - - how long were the kids there?

A        Probably it depends, four to eight hours.  It just depends on what they worked.

Q        Any other jobs that you've had other than this child care in the past?

A        No.  Just when I think I worked a summer job.  That was a long time ago.

Q        Okay.  What was that job?

A        We had to mow, paint - -

Q        Okay.

A        - - and stuff like that.

Q        Who was that working for?

A        Summer Job Program for the Children when he was younger.

Q        Okay.

A        I don't know exactly.

Q        Is that also something through the state?

A       It was for - - I don't know.  I really don't know.  That's when I was rating I think, what 13?  Well, the first year we had to go.  But when I first worked on it, when we went to half the day we was in school and half a day we painted and swept and stuff like that.

Q       Okay.  This is when you really got it.

A       Yeah.

Q       All right.  Okay.  So why was it that you stopped working in June of 2003?

A       I was drinking and I was so depressed.  I turned to alcohol.  I didn't know what to do.

Q       Okay.

A       I got a DUI and I lost my job.

Q       Okay.  Tell me are you still using alcohol?

A       No.

Q       All right.  You say no, but are you using alcohol socially or not at all?

A       Once in a great while, like New Years, we drink a few, just for like special occasions, I guess.  Once in a great while.

Q       Okay.  Have you received any treatment in the past for alcohol abuse?

A       I checked myself into UHC, United Hospital Center.

Q       When was that?

A       2003, 2004, something like that.

Q       Okay.  And since that time have you had your alcohol consumption under control?

A       Yeah.

Q       Okay.  Was that an inpatient or an outpatient program?

A       Inpatient.  We had to stay in there.

Q       Okay.  And they cleared you when you were released?

A       Uh-huh.

Q       All right.  So tell me in your own words what it is that makes you unable to work now. What's your biggest problem?

A       I hate to get out of bed sometimes.  I don't know.  My depression and my pain.

ALJ         What is it?  I'm sorry?

CLMT       I hate to get out of bed sometimes.  I feel like I just don't want to move. My depression and my pains in my back.

ATTY        Okay.

ALJ         Okay.

BY ATTORNEY:

Q       Now let's talk a little bit about the, the depression issue.  Are you receiving treatment for depression?

A       Yes.

Q       And who are you receiving treatment from?

A       Dr. Shantron.

Q       And how long has that been going on?

A       Since 2003.  Since I went to the hospital.

Q       Okay.  After you were released from the alcohol program?

A       Yeah.

Q      Or did he help with that?

A      Well, they helped me get in there.

Q      Okay.  All right.  Are you taking any medications for the depression?

A      Yeah.

Q      And can you remember what they are?

A      Well, they're depression medicines, Lexapro.  Trileptal is a stabilizer.  I don't know what that kind.  That's for - - that's supposed to help your mood or something.  The Seroquel is supposed to help sleep, I think.  What else - - see, that's what he gave me in Guthridge.

Q      Well, what kind of symptoms do you have with your depression?  You said you have trouble getting out of bed in the morning.  Anything else?

A      Uh-huh.

Q      Tell me about you know, how you feel?

A      I feel like I'm worthless.  I don't have - - I don't know.  I hurt, I don't feel like leaving the house sometimes.  And I don't like being around a lot of people a lot.  Thoughts go through my head constantly.

Q      What kind of thoughts?

A      Everything.  One thing right after another, it can just race.

Q      Okay.

A      Quickly.

Q      You're saying your mind races?

A      Yeah.

Q      Okay.  What's it like when you get around a lot of people?  What kind of symptoms do you experience then?

A      You think people's talking about you.  And they look at you and you think they're staring at you like yeah.  And you - - it just gets on your nerves and you get aggravated and stuff like that.

Q      Okay.  Has that led to any, any type of violent outbreaks for you?

A      My - - maybe a couple of times.  I asked them what their problem was and all this other happy stuff.

Q      Okay.  What about - - what other mental symptoms do you have here?

A      I have COPD, open.

Q      Now - -

A      - - post traumatic stress syndrome - -

*          *          *

A      Post traumatic stress syndrome, depression.  That's what made her quit.  The anxiety, panic attacks.

Q      Okay.  Let's talk a little bit about some of those?  Tell me about your panic attacks?  What's that way?

A      I can't - - your chest hurts and you can't breathe.

Q      Okay.

A      You start crying and I just get scared.

Q      How often do you experience those panic attacks?

A      Sometimes they can happen every other day, sometimes you can take a little bit,

just I don't know what it is.

Q     Okay.  Does anything make them better or worse or happen more or less frequently?

A     Not I know of.

Q     Being around people make them better or worse?

A     Sometimes.

Q     Sometimes better, sometimes worse?

A     Sometimes worse.  It depends what kind of situation I guess you're in.

Q     Okay.  Are they better or worse in stressful situations generally?

A     Yes.  They're worse in stressful.  When I was stressed out, I was having them left, left and right.

\*        \*        \*

Q     Okay.  How long do these panic attacks usually last?

A     They can last up to weeks.  I mean, not constantly but it'll stop and then another one will come on later on or something.

Q     Okay.  Well, when, you know, from beginning to end, one attack, how long is the longest that takes?

\*        \*        \*

A     I don't know.  I've never really timed them.  I've never really thought about it.  My head would hurt and I never thought about it.  I just laid down after all that because I'd have a real bad headache after that.

Q     Okay.  Do you have any medication or anything to help with the panic attack?

A     I guess what Tolectin (phonetic) and Seroquel and Lexapro is all supposed to help it all, combined together, I guess.

Q     All right.  Tell me about your post traumatic stress disorder?  How's that affect you?

A     I guess that's - - I don't know - - they told me I had that from when I was younger.

Q     What happened?

A     I was I guess you would say, molested by my brothers, oldest brother.

Q     Okay.  All right.  I have written down here on my list paranoia and worry.  Tell me about paranoia and worry?

A     Paranoid all the time.  I don't let my kids through my house.  I get nervous when you go down the hill or ride your brake.  I don't trust anybody.  I all - - I just like to keep them close.  I don't even like for them to go to their grandparents.  That's bad ain't it?

Q     That's interesting.  What about you in leaving the house?

A     I don't like to leave the house if I don't have to.  Sometimes I don't make it to some doctor's appointments and have to reschedule.

Q     Okay.  One of the most recent times we met, you told me a story about a time you were in Wal-Mart.  And you thought somebody was staring at you.  I just want to give the Judge an example - -

A     Oh - -

Q     - - of what this is like.  So can you tell him that story?

A     We was at Wal-Mart and this guy was leaning over I guess the restroom like this.

And I don't think you want me to use his language.  I looked at him and asked him what his F-ing problem was?  I said I told him I'd poke his eyeballs out if he wanted to stare at me.  Because he had not right to stand there and stare at me and keep looking at me.

Q        Okay.

A        On the wall he was just going like this.

Q        Okay.  All right.  What about your weight and the eating disorders and things of that nature?  Do you have any problems in that area?

A        Yeah.

Q        Tell us about that?

A        I get - - every time I eat, I feel worry.  I don't like to eat.  I'll either - - I guess you'd say anorexia and bulimia.

Q        Uh-huh.

A        Because sometimes it'll come up by itself and sometimes I'll help it.

Q        Okay.

A        I've had that since I was young.

Q        Okay.  Has your weight fluctuated then over the years?

A        Yeah.

Q        Okay.  How - - what size are you now?

A        Size?  My pants are between 6 and 8.  It depends how they're made.

Q        Okay.

A        That's still too big.

Q        Okay.  All right.  What about sleeping?  Are you talking about taking a Seroquel?  What kind of problems do you have sleeping?

A        I can't sleep.  If I do, when I do get to sleep, it seems like I can't, don't want to get up.  Because some days I can just stay there and not be able to sleep at all.  Even the Seroquel, they have to up it.

Q        Okay.  What time do you normally go to bed at night?

A        Oh, between 9:00 and 11:00.

Q        Okay.  And what time do you get up in the morning?

A        5:30.

Q        So how much actual sleep time do you think you get in between then?

A        Honestly?  Because I have to get up and go back to Norris - - probably maybe an hour or two hours.

Q        Okay.  You started to say something about getting up.  Are you getting up in the night?

A        Yeah.   I have to get up to go to the bathroom or get up to go get something to drink or smoke a cigarette or sit and watch TV.  Because I just can't lay still.  Some because I'll lay there and fall asleep, then I'll wake back up and I'm awake for a while.

Q        Okay.  Okay.  Tell me a little bit about your physical problems, you mentioned a little bit of back earlier in your testimony.  Tell us about that?

A        My back, it hurts if I sit here.  And when I go to get up, I'm - - ain't going to be able to stand straight up when I get up.  Because it hurts when it works anymore.  It, it hurts to stand up too long.  I can't stand to do my dishes so I decide to sit down.  Finish those after I rest my legs.  Because my back, it just hurts.  I have a bulge and the vertebra is messed up they said.

41

Q  Uh-huh.  I see you can't stand long enough to do your dishes.  What about sitting, do you have trouble sitting too?

A  Yeah.

Q  All right.  How, how, long can you sit without having to get up and move around and things like that?

A  I, I can keep wiggling around.  Moving from place to place it helps a little bit.  But not too much.

Q  Okay.  You're sitting down and you're trying to wiggle around to, you know, alleviate some of the pain.  How does that affect your ability to, to concentrate and stay on task?

A  Yeah.  A lot.  I forget where I'm at all the time or what I'm doing.  Not where I'm at, but - - well, if you're reading a book or something.  Like the kids homework, I forget what I'm doing with them.

Q  Okay.  Now, you referring that to the back pain that you both had and your mental problems?

A  To both that and my mental problems.

Q  Okay.  All right.  What about walking?  Do you have any trouble walking in relation to your back?

A  Yeah.  Because my legs, I have that fibro mania neuralgia.  I don't know what the name of it is.  Because it hurts from my knees down in my feet and stuff.  They're swollen and hurt.

Q  Okay.  How long has the foot swelling been going on?  That's something relatively new?

A  Actually the first I, first noticed, it was my toe.  My one toe would swell up.  Now it's both of my - - from about right here on my foot, all the way down, swells up.

                    *              *              *

Q  Okay.  So how well do you think you could walk in a row without having to stop and rest or sit down?

A  I, just to walk down my hill to check my mail, I stop and rest before I come right back up.

Q  Okay.  How far is it from your house to your mailbox then?

A  Oh, I don't know.  It wouldn't be a mile.  Not that long.

Q  How, how far?

A  I said it wouldn't be a mile.  And it - - I'm not good with measurements and all this other stuff.

                    *              *              *

Q  What about, what about some kind of numbness.  What kind of numbness are you having?

A  My hands will go numb.  My face will go numb.  My hands just go numb.  They draw up and they hurt.

Q  What's the reason for that, do you know?

A  It's like my face used to do that too.  It used to sit and my mouth and my eyes would sit in a position, my grandma said I looked and acted like that I had, I had the seizure.  But they could never figure out what it was.

Q  Uh-huh.  Have you reported this to your doctors then?

A      Yeah.  That's when he found out my brain was small.

Q      Okay.  Tell us about your brain being small?

A      Uh-huh.  That's all I know.  It just it was small.  It's either shrinking or naturally small.  I'm not sure.

Q      Okay.  Are you still having the problems with your hands drawing up?

A      Sometimes.

Q      How often are you having that issue?

A      Oh, I think last time - - my hands go numb if I lay on them.  I can't lay still long, too long.  But if I - - the last time it did it was, I don't know if it was November or October, that I had to go to a doctor about it.

Q      Okay.  What doctor did you see about it?

A      Hospital.

Q      The hospital.  Okay.

A      Yeah.

Q      Which hospital?

A      Dinsmore Hospital.

Q      Okay.  Anything make the hand problem better or worse?

A      Not that I know of.

Q      Okay.

A      It just comes and it starts tingling and it gets worse.

Q      All right.  Now you also have COPD?

A      Yeah.

Q      All right.  Tell us about that.  How does that affect you?

A      It's hard to breathe, the air comes.  Walking up stairs, and stuff like that it's just hard to breathe.

Q      Okay.  Do you receive any treatment for the COPD?

A      I have an inhaler.  Well, I actually got two.  One I'm supposed to use every day and the other one is when I get like I use it with the other one that I have like bronchitis or something.

Q      Uh-huh.

A      And I have the nebulizer.  It has medicine for it.

Q      Okay.  How often do you have to use the nebulizer?

A      The nebulizer is supposed to be every four hours.

Q      Okay.  How long does it take you to use the nebulizer?  What - - how long is the session of that take?

A      Oh, I think they're only like 10 minutes, 15 if that.  Because the other like four - - it might be five, it depends when that solution comes out.

                            *               *               *

Q      All right.  So going back - - I'm sorry, I got off track with you - - back pain.  Are you taking any kind of pain medications or anything for your back?

A      I have - - what is that one called?  It's Darvocets.  And these, that's the pain pill.  And Baclofen, it's a muscle relaxer.  And then I have Turmedol, Tramodol.  And it's like a pain pill too I think.

Q      Uh-huh.  How often do you take those medications?

A It's every day.

Q Okay. Is there any side effects from those medicines?

A No.

Q Okay. All right. Tell me about your typical day? What do you do all day?

A Well, the kitchens I got to get up. And just tell you, get the kids, yell by their name. And they get up out of bed. They get dressed. They come down and get their shoes on. I haven't done anything. All I got to do is fix their hairs. Because they pretty much do the rest. And make sure they're all bundled up to get out the door. And they go to school. I'm just there. Either sit there and watch TV, and wash my clothes, and make my bed, and get to figure out what I'm going to make for dinner.

Q Okay. Is your house pretty clean?

A Yeah.

*   *   *

Q All right. So do you have any troubles doing the chores around your house?

A Yes. I can't carry clothes up and down the steps. So I put them on the hangers and double them up, and all the kids put their clothes away.

Q Okay.

A Then the kids help me with the dishes. They even help with the dishes and cooking.

*   *   *

Q Okay. All right. All right. So during the day you watch TV. What kind of stuff do you watch?

A I don't know. Wait a minute. NCI. Matt, is that what it is? It's a crime scene. It's a show.

Q Uh-huh.

A CSI. There we go.

*   *   *

Q Are you able to stay focused and pay attention to your shows?

A No, I miss half of them.

Q Why is that?

A Because I'm always doing something else too.

Q Okay. How so? Explain that to me?

A I can't stand dust, so I got to make sure my coffee table, a speck of dust get - - or a spot get it off my table. I then got to straighten my table up or I'm in the kitchen putting dishes away or make sure there's wood in the fire. Checking my clothes.

Q Uh-huh.

A Put my dog out on a leash.

Q So it sounds like you're doing a lot of things there. I'm trying to think of a way to ask you this without feeding you too much. But are you able to stay focused on one thing for a long period of time?

A No.

Q Okay. Explain that to us?

A I get off track task real quick, like homework. A kid will ask me a question and I'll be sitting there thinking about it. And then I'll go and search of something else.

Q        Okay.  The same thing when you're doing your chores?

A        Yeah.

                        *                *                *

BY ATTORNEY:

Q        What did I ask you?  Are there things that you can't do now that you used to be able to do before?

A        I used to go play ball with my kids.  And now I can't do that.  I can't walk too far.  I can't concentrate on much of the movie with them.

                        *                *                *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q        Has this appeared in the, the abundance of SGA level or I don't remember the earnings record right off hand.

A        I don't recall the earnings record either, Your Honor.  I just add the, the work was 1998 to 2001, child care provider.  Which is medium and semiskilled.

Q        Medium and semiskilled.  Oh, okay.  Now, let me ask you to assume a hypothetical individual of the claimant's age, education and past relevant that the work history, you would be able to perform a range of light work, would require a sit/stand option.  Could perform postural minutes occasionally, except could not climb ladders, ropers or scaffolds.  Should not be exposed to temperature extremes or environmental pollutants.  Should work in a low stress environment with no production line type of pace or independent decision making responsibilities.  Would be limited to unskilled work involving only routine repetitive rote tasks.  Should have no interaction with the general public and no, no more than occasional interaction with others.  Would there be any work in the regional or national economy with those ratings?

A        At the light level, Your Honor, the hypothetical individual I believe could function as a machine tender.  Light, 327,000 nationally, 2,500 regionally.  Or as office assistant, light, 150,000 nationally, 1,875 regionally.  And the region is West Virginia, Eastern Ohio, Western Maryland and Western Pennsylvania.

Q        Yeah.  You got a - - if you would reduce that to sedentary, and retain the other in addition.

A        At the sedentary level, I believe that hypothetical individual, Your Honor, could function as a general sorter, 50,000 nationally, 550 regionally.  And also at that level, a machine tender, 141,000 nationally, 1,400 regionally.

Q        And is anything I your testimony inconsistent with anything contained in the DOT?

A        I don't believe there - - it is, Your Honor.  No.

Q        All right.

                        *                *                *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        Mr. Bell, at Exhibit 31-F in the records.  We have the records from Appalachia Community Health Center, Dr. Dillard Tandrun.  At various points through these records, he refers to Ms. Rhodes as having poor concentration and later marked deficiencies in concentration.  If that were the case, and she were going to be off task for a one-third to two-

thirds of a typical work day.  Would there be any jobs available for her at, at any exertional level?

A      No.  That would not allow her competitive work continually.

Q      And further if she were going to miss more than three days per month of work as it relates to her various mental and physical problems?

A      That would be excess of absenteeism and not be tolerated.

Q      Okay.  Thank you, Mr. Bell.

*           *          *

Testimony was taken at the hearing held on January 8, 2009.  The following portions of

the testimony are relevant to the disposition of the case:

OPENING STATEMENT BY ADMINISTRATIVE LAW JUDGE:

ALJ      I do note that we have had a prior hearing in this matter.  That resulted in an unfavorable decision by me, dated March 20th of 2007.  I would say that that appears to be administratively final, or is it still pending, Mr. Isner?

ATTY      No, it's administratively final.

ALJ      Okay.  Then the period under adjudication is in this case will be from March 21 of '07 through the present and I note that in view of the AOD as of June 1 of '03 here.

*           *          *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q      All right.  We covered some of these things at the last hearing, but have you had any additional education since we were here last time?

A      No.

Q      So to summarize, you made it through the eighth grade?

A      Yes, sir.

Q      You dropped out?

A      Yeah.

Q      And you attempted to obtain your GED at some point, correct?

A      Yeah, I did.

Q      And did you finally obtain the GED?

A      Yeah, I got that whatever year I got pregnant with Jessie.

Q      No education or training at all beyond high school?

A      No.

Q      Have you worked any since we were here for our last hearing?

A      No.

*           *          *

Testimony was taken at the hearing held on January 8, 2009.  The following portions of

the testimony are relevant to the disposition of the case:

Q      We were here back at the end of '06, I think, or early part of 2007.  At that time

you talked about a variety of problems that you had physically and mentally. I'd like to try to go through those problems again, but I'd particularly like you to direct your attention to how those problems have changed, gotten better, gotten worse since we were here the last time. Is that fair?

A      Yeah.

Q      Okay. Since the time we were here last, what do you feel like is the most significant physical or mental problem that you have that makes you unable to work?

A      My back pain, my leg pain, depression anxiety and panic attacks.

Q      Okay. Now let's start with the physical symptoms then. Can you describe the pain in your back for me? Are we talking about upper back, lower back - -

A      It's lower back.

Q      - - mid back?

A      It's from here down in the bottom of the spine form, I don't know, right now through there.

Q      Okay. How long have you been experiencing pain like that in your back?

A      For while.

Q      Okay. What type of limitations does that cause you?

A      I can't lift that much. Standing or walking, I can't go up my stairs that much. I just avoid going up the stairs much.

Q      Okay. Any problem with sitting or stooping?

A      Yes. I have to get up and move around and sit back down.

Q      Okay. What type of treatment have you received for your back since the last time we were here?

A      They give me pain medicine. I think they're called Hydrocodone, five, Vicodin, I don't know the names of them. I'm not good with medicine.

Q      Are you still taking those?

A      Yes.

Q      How often do you take those?

A      Every eight hours, I think.

Q      Okay. Any other treatment, physical therapy, anything like that for your back?

A      No, no. Nothing since the last time.

Q      Is there anything they've recommended that you do that you haven't done?

A      They wanted me to go to a pain doctor so he can give me shots in my back, but I hate needles and I don't think I can lay there and get five shots in my back. I can't do that.

Q      Who recommended that you go to the pain doctor?

A      They tried me there. I went for the one time. It was when I was going to Dr. Roberts' office. I went there one time, but he was telling me what he was going to do and uh-uh, I never went back. I can't do shots.

Q      Okay. What about your knees? Tell me what's going on with those.

A      They just hurt from my knees down and my elbows and down. They hurt. I don't know why. They just hurt and it hurts walking if I have to go up steps or anything. If I lay down in bed, I can't get comfortable because it hurts. I'm more awake than I am asleep half the time.

Q      Okay. What kind of treatment, if any, are you receiving for your knees?

A      Just the same thing. The pain medicine, I guess, is for, they gave me a shot about one time in my knee and made it worse, sir.

Q     Is there anything they recommended that you do for your knees that you haven't done at this point?

A     No.

Q     What kind of problems do your knees give you?  Trouble walking, sitting, standing -     A     Yeah.

Q     - - running?

A     I can't run.  I couldn't run if you paid me.

                    *                    *                    *

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q     Do you take a medication for anxiety or panic problems?

A     No.  They had me on, well, he's got me on a depression medicine that's supposed to help with that stuff, but it don't help it.

Q     Did you take it today?

A     Yeah.  I take my medicine in the mornings.

Q     All right.

A     He's going to, when I go back to see Dr. Chandry. (Phonetic), he said he's going to try me on another medicine to go with the depression medicine to help with the anxiety.

                    *                    *                    *


RE-EXAMINATION OF CLAIMANT BY ATTORNEY:

Q     Do you know what medicine it is that you're on right now for the depression and anxiety?

A     It's like Lexapro.   It's just a generic version of it, but I can't remember the name of it.  I'm not good with names.

                    *                    *                    *

Q     How long have you been on that?  Do you know?

A     He got me, he put me on this one, was it last month, the month before, I'm not sure.

Q     Have you tried other things in the past?

A     Yeah.  I've tried Cymbalta.  I've tried all kinds of medicine.  I just can't remember all the names to them.

Q     Okay.  Have you ever been on Xanax or Valium or anything like that?

A     No.

Q     Okay.  How often are you seeing Dr. Chandry?

A     I think it's every two months.  He's so busy.

Q     Are you getting any type of counseling or therapy or anything like that, too?

A     I seen a coordinator every time I had appointment with the therapist something happened and I could never make it so I never got another appointment made.

Q     Okay.  Is that something that you're going to try to schedule in the future?

A     Yes.

Q     How often do you experience panic attacks?

A     It just depends, I guess.

ALJ          Just what?

48

CLMT        It just depends.  I have them, I have to just like, I can't even get tickled without having anxiety attacks a lot of times.  He was trying to tickle me one day on my feet.  I started hyperventilating and I don't know, it's just stupid little things bring it on, I guess.  I do it a lot.

Q        Does anything make them, you know, better or worse?  Anything happen more often or less often?  Anything you can do to manage them?

A        I don't know.  You just got to calm down, breathe.

Q        Okay.  What, you said you hyperventilated.  What else - - is this morning fairly representative of what you go through when you have one of those?

A        Yes.  But then it makes you feel like you're having a heart attack or something because your chest hurts and you can't breathe.  It just feels like it's all collapsing.

Q        This morning I think the whole episode was over in three or four minutes.  What, is that about an average length for them?  Can they be shorter?  Can they be longer?

A        Yeah.  They could be shorter.  They could be longer.  It just depends.

Q        When is the last time you had something that happened to you before today?

A        Maybe about a week, two weeks ago or so when he was trying to tickle me and that's when I had it.

Q        Was there anything particular about the setting this morning that triggered it?

A        I just can't stand being around people.  I get nervous and everything.  I get nervous.

*        *        *

Q        Since the last time we were here those, have they gotten better or worse, more frequent, less frequent?

A        More frequent.

Q        Okay.  Are you all right?

A        Yeah.

Q        What's, what's a typical day like for you?

A        Typical day?  Kids go to school.  I set down and try to watch TV and usually just lay there and go to sleep until it's time for them to come home and get them something to eat.  I try to cook something as quick as I can so I don't have to stand.  Well, I'm up and down anyways.  And then they get their baths, get ready to go to bed and then around 10:00, 11:00, I try to lay down and if I start hurting I get up and I get in the bathtub.  I'm usually in the bathtub two to three times a night, just trying to get relaxed enough to go to sleep.

Q        Okay.  What type of chores, you know, do you do around the house?  Do you do the cooking, the cleaning, the laundry, dusting, sweeping, anything like that?

A        I cook.  I have to do laundry, but the kids bring the laundry down to me and they put their own clothes and stuff away.  I just wash it and dry it.  They do the rest.  They do the dishes.

Q        They actually, they carry it down the stairs, wherever?

A        Uh-huh.

Q        Do they put it in the machines or do you put it in?

A        They just give it to me and I have to put it in the machines because they ain't figured out, they can't quite  do the machines yet.  They get confused.  They put them away and I don't do dishes.  They do.  I vacuum.  Of course, it's not a very big area to vacuum.  I dust.  I sit

there and watch my dust and eventually I'll dust maybe once or twice a month. I can't stand to dust.

Q      Okay. Has your ability to do these types of household chores changed between the last time we were here and today?

A      Yeah. I used to do a little bit more.

Q      How come you don't now?

A      Because it just hurts. I figure I can't keep up. I just sit there and say forget it and just lay down and go to sleep and just wait for them to come home and they help with everything.

Q      Okay. The cooking that you do, do you cook, you know, full meals? Do you - -

A      Sometimes.

Q      Okay.

A      Sometimes it depends if I really feel bad I'll wait for pizzas get done and they'll eat that. I mean it just depends. I only have to cook one meal a day.

Q      Okay.

A      Because they get up and when they're not in school they eat cereal for breakfast.

Q      Okay.

A      And lunchtime they usually like sandwiches or Ramen noodles so I don't have to do that. They do that in the microwave.

Q      What about you cooking for yourself for the other two meals a day?

A      I don't cook for myself.

Q      You don't cook for yourself?

A      No. I cook for the kids. I just grab whatever if I want it.

Q      All right. What, there's some talk in your medical records about you experiencing headaches. Can you tell me what those are like?

A      Migraines. They hurt. I have false teeth. Even though I have false teeth you'd think I have real teeth because my gums will hurt when I have a headache. The back of my head, the front of my head, my ears, everything just hurts. It hurts so bad you just want to sit and cry.

Q      How often do you experience the headaches?

A      Three or four times a week.

Q      How long do they typically last?

A      If they go away then they'll come back. Some last for days. Some just come and then I'll end up getting one again next evening or something. It just depends. Sometimes I wake up with them.

Q      Can you function at all when you're going through one of those headaches?

A      I can function. It just hurts. All I want to sleep and keep my eyes closed and try to get it over with.

Q      What kind of medication or treatment or anything do you take for the headaches?

A      The Hydro's are for all the pain, the Hydrocodone, Vicodin, whatever they're called.

Q      Okay. Do you take, I know you said you take one of those every eight hours. Do you take an extra one or anything when you're having a headache like that?

A      Yeah. I do when I have headaches.

50

Q       Is there any type of treatment they're recommended for the headaches that you haven't done or you plan to do in the future?

A       Yeah.  (INAUDIBLE), I just tried all of his medicine.  I'm allergic to most of the stuff he gives me.  They wanted to give me botox shots in my head, but they don't pay for that.  So they are going to wait until it gets approved and then I guess maybe I can get it in the head.

Q       Okay.  Anything make the headaches better, worse, more or less frequent?

A       Better?  I don't know of anything that makes them better.  Light makes them worse.  I don't know.

Q       Do you get them more or less often if you go out of the house in public, those types of things?

A       Yes, stress.

Q       Stress makes them worse?

A       Yeah.  When you have to go out.  I hate going out.

Q       How often do you get out of the house?

A       Well, let's see.  Today is the first real day I've been out of the house.  I don't go out unless I really have to go out, unless I take the kids to a doctor or go get them from school if they're sick or take me to go to my Uncle Bill, and the grocery store and that's it.

Q       Do you drive?

A       No.

Q       So you do do the grocery shopping for the family?

A       No.  Me and Ray does.  We just take it out and the kids carry it all in the house.

Q       Okay.  All right.  Do you ever have, you know, any anxiety issues, headache issues when you get out and go to the grocery store and things like that?

A       I usually have headaches before I leave.  You never know.  Well, sometimes I think, I mean sometimes they came on at Wal-Mart, but that might be because of the light, I don't know, or people.  I always blames them on the light.

Q       Okay.  Now you also, you've got some blood pressure problems.  Is that true?

A       Yes.

Q       Are you taking medication or doing anything for that?

A       Diovan.

Q       Okay.  Has that impacted your ability to take some of the other psychiatric medicines and things like that?

A       Yes.  Every time my neurologist gave me something it raised my blood pressure and then I end up at the emergency room because I couldn't get it down.

Q       Okay.  Also we talked about your medical records about fibromyalgia.  Can you tell me what that, what that is?

A       Not really.  I don't know much about it either.

Q       Okay.  Do you know how that affects you?

A       They said like some kind of pain.  I don't know how would you explain it.  I'm not sure.  I really don't know much about fibromyalgia.

Q       Do you think that's what causes the pain in your back, knees, elbows, any of these areas?

A       My arms and my legs and stuff like that, they say that's what it is, but that's about all I know about fibromyalgia.

Q	Okay.

A	The only way they test for that is tender spots.   They touch you so many different places.

Q	Okay.  Lifting, how much can you left or carry?  Can you carry a gallon of milk, a bag of dog food?

A	I can carry a gallon of milk.  No, I don't carry dog food.  I don't carry dog food.

*		*		*

Q	Okay.  How far could you walk without having to stop and take breaks or rests?

A	I don't know.  I don't walk nowhere.  I don't walk nowhere.

Q	How long can you sit without having to stand?

A	Right now it's hurting so I don't know how to time that either.  I don't know, 15, 20 minutes and then I got to get up and move again.

Q	Do you have to shift positions and move around a lot when you're sitting?

A	Yes, yes.

Q	All right.  How long can you stand without having to sit back down?  Do you have any trouble standing?

A	Then my legs start hurting.  Then I got to sit back down.

Q	Okay.  All right.  The last thing I wanted to ask about is we talked a little bit last time about you have post traumatic stress disorder.  Can you tell us about that?

A	Why I got it?

Q	Sure.

A	When I was little a boy touched me and shouldn't have, I guess.  I never told nobody until a couple years ago.

Q	What about the past relationship with your husband?

A	He's very abusive.  I'll be sleeping.  I'd be woke up from him hitting me or dragging me out of bed.  I was always on edge when I was around him because you didn't know if he was going to touch you or do something, anybody, so I'd just stay on edge.  My kids, they slept in my room with me because I didn't really trust him.  I wanted to keep them safe so I just had my kids stay in my room with me and I'd lock the door at nighttime.  Sometimes we had to crawl out the window because he'd be going off.  I had to throw myself over the top of (INAUDIBLE) so he won't touch us, or her actually.  I don't want him to touch her.  And he was always smart.  He always hit me and hid our kids so no one could see.

Q	Did you get any medical treatment or go to the hospital or anything like that as a result of - -

A	No.  When I finally had him removed from my house they asked me if I wanted to put him in jail.  I said do you (INAUDIBLE).  He was sitting right there and they got him removed from my house and other than that I haven't had to deal with him.  I wouldn't get a doctor at the time he hit me in the kidneys.  I had to walk bent over for a week.  I was afraid my grandma would find out and she'd go off.

*		*		*

ALJ	All right.  I've got a bit of a cold myself.  I am going to give the same RFC that I gave in the last, well, first before we get there, let me ask you just to state as succinctly as you can what you feel, if any, what conditions, if any, have worsened since the last hearing and in what way.  If you want to summarize what your evidence is, you can, Counselor,

52

or she can answer it.

  ATTY   Sure, Judge.

  BY ATTORNEY:

  Q  What he's asking, Crystal, is what conditions that you've had, that you have, have gotten worse since last time we were here.

  RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

  Q  Right.  What would make me change my - -

  A  My mental and my back.

  Q  Your back and your mental condition?

  A  Yes.

  Q  That's what you think it is?

  ATTY   And that would be my position on the case, Judge, is I think there's probably been a general worsening of the physical condition to some extent evidenced by her, you know, reliance now more on her children.  They do household chores that she testified last time that she could do more of, but I really think, you know, the case turns on whether you believe the mental condition has worsened to the point that it limits her ability to maintain concentration, persistence, pace and be exposed to people because I've known Crystal for a long time on a personal level and I can, I think, see a difference in her from then to now, you know.

  ALJ   All right.  I'll look at those particular areas and closely.  As I said, I am going to give the same RFC so we can either go ahead and go through with that or just go with the vocational testimony from the last hearing.

  ATTY   No.  I'm perfectly fine with our vocational testimony from last time.  I believe I asked if, last time if her concentration, persistence and pace would be so - -

  ALJ   Right.

  ATTY   - - affected, could she work, so I'm on fine on that, Judge.

  ALJ   All right.  Then in that case I think we can simply close the record at this point and adjourn.

*    *    *

E.  <u>Lifestyle Evidence</u>

  The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life:

- gets her children ready for school (Tr. 114, 790)
- prepares own meals and meals for her children (Tr. 114, 116, 133, 135, 778, 790, 792)
- cares for children (Tr. 115, 777, 790)
- needs medication to sleep (Tr. 115)
- does not eat much (Tr. 115)
- needs reminders to take medication (Tr. 116, 134, 777)
- does house work but needs help (Tr. 116, 133)

- does not drive because license was taken away - DUI (Tr. 117, 136, 628, 779, 793)
- rarely goes outside (Tr. 117)
- goes shopping (Tr. 117, 628, 779, 793)
- is able to count change but is not able to pay bills, handle a savings account, or use a checkbook/money order (Tr. 117)
- is able to pay bills and count change but is not able to handle a savings account or use a checkbook (Tr. 136)
- is able to pay bills, count change, and use a checkbook but cannot handle a savings account (Tr. 779)
- can pay bills, count change, and handle a savings account but cannot use a checkbook (Tr. 793)
- has no hobbies (Tr. 118, 137, 794)
- helps girls do homework (Tr. 118, 790)
- hardly goes anywhere besides the doctor's office (Tr. 118, 137, 597, 628)
- has trouble getting along with others and her family (Tr. 119)
- has a short attention span (Tr. 119, 138, 781, 795)
- does not follow written or spoken instructions well (Tr. 119, 781, 795)
- follows written and spoken instructions "okay" (Tr. 138)
- does not like to be told what to do (Tr. 120)
- does not handle stress or changes well (Tr. 120, 139, 782, 796)
- does laundry (Tr. 133, 135, 605, 625, 776, 778, 792)
- washes dishes (Tr. 133, 776)
- has trouble sleeping (Tr. 134, 598, 777, 791)
- has trouble getting in and out of a bathtub (Tr. 134, 777)
- cannot stand up in the shower (Tr. 134, 791)
- has trouble lifting her arm to comb her hair (Tr. 134, 777, 791)
- unable to do yard work (Tr. 136, 779, 793)
- spends time talking with others (Tr. 137, 780, 794)
- has trouble being around lots of people (Tr. 138, 594, 781, 795)
- does not get along with authority figures (Tr. 139, 782)
- has trouble getting out of bed in the morning because of depression (Tr. 593)
- has trouble sitting (Tr. 599-600)
- cannot carry laundry up and down the steps (Tr. 605, 625)
- watches television (Tr. 605-606, 790)
- has trouble climbing steps (Tr. 619)
- dusts and runs the vacuum (Tr. 625, 778, 792)
- has her girls do the dishes (Tr. 625)
- feeds pets (Tr. 777)
- can no longer play ball with her kids (Tr. 780, 794)
- puts dogs on chain outside (Tr. 791)
- numerous references to Claimant's alcohol use throughout the record

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant argues that the ALJ erred by concluding that Claimant has no medically determinable impairments, individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for Listings 12.04 and 12.06.  Additionally, Claimant argues that the ALJ erred by finding that Claimant was not entirely credible and using Claimant's alcohol troubles as a basis for discrediting Claimant.

Commissioner contends that the ALJ correctly concluded that Claimant's mental impairments did not satisfy the requirements of Listings 12.04 or 12.06 of the Listed Impairments. Further, Commissioner contends that the ALJ correctly found that Claimant's subjective complaints of pain and functional limitation were not entirely credible and the ALJ properly considered Claimant's use of alcohol in determining credibility.

B.    Discussion

1.    Whether the ALJ Erred by Concluding that Claimant's Impairments did not Meet the Requirements of Listings 12.04 and 12.06.

Claimant argues that the ALJ erred by concluding that Claimant's impairments did not meet the requirements of either Listing 12.04 or 12.06.  Claimant argues that she meets the requirements of both A and B under Listing 12.04 for affective disorders.  According to Claimant, she meets the requirements of A because she has been diagnosed with major depression by multiple doctors, characterized by anhedonia, appetite disturbance, decreased energy, difficulty concentrating, and feelings of worthlessness.  Claimant contends she meets the requirements of B because she suffers from at least two of the listed restrictions: marked restrictions of activities of daily living, difficulties in maintaining social functioning, and repeated episodes of decompensation.  Additionally, Claimant argues that she meets the

requirements of both A and B under Listing 12.06 for anxiety-related disorders. To meet the requirements of A, Claimant states she has been diagnosed with suffering from recurrent panic attacks. Claimant states that she meets at least two of the listed restrictions under B: marked restriction of daily living, difficulties in maintaining social functioning, and repeated episodes of decompensation.

Commissioner contends that the ALJ correctly concluded that Claimant's mental impairments did not satisfy the requirements of either Listing 12.04 or 12.06. First, Commissioner notes that this argument undermines the December 30, 2008 pre-hearing memorandum submitted to the ALJ in which Claimant conceded that the file did not support a conclusion that her impairments met or medically equaled the requirements of any of the Commissioner's listed impairments. Commissioner next contends that Claimant fails to meet the B criteria under 12.04 and 12.06. Commissioner argues that Claimant's mental disorders do not satisfy the requirements of B because Claimant does not have a "marked" or "extreme" limitation in any of the four domains of functioning. Finally, Commissioner contends that Claimant's mental impairments do not meet the requirements under C and Claimant fails to make any argument to the contrary.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.; see also, 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays,

907 F.2d at 1456. "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

In evaluating disability, the ALJ must apply a five-step analysis. At step two, an ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." Id. at §§ 404.1520a(b)(2). At step three, the ALJ must determine whether the claimant's impairments "meets or is equivalent in severity to a listed mental disorder." Id. at § 404.1525a(d)(2). Claimants who meet the requirements of a listed impairment will be deemed conclusively disabled. Rabbers v. Commissioner Social Sec. Admin., 582 F.3d 647, 653 (6th Cir. 2009). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

Listing 12.04 Affective Disorders requires that the claimant suffer from a "disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. To meet the required level of severity, the claimant's impairments must meet both A and B or satisfy the requirements of C. Id. To satisfy part A, the claimant must present medically documented persistence, either continuous or intermittent, of depressive syndrome, manic syndrome, or bipolar syndrom with a history of episodic periods. Id. The requirements of B are satisfied by showing two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration." Id. The requirements of C are met by demonstrating "[m]edically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medial or psychosocial support, and". . . "repeated episodes of decompensation", "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate", or "current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." Id.

Listing 12.06 Anxiety Related Disorders is characterized by anxiety as "either the predominant disturbance or it is experienced if the individual attempts to master symptoms . . . ." 20 C.F.R. pt. 404, subpt. P, app.1, § 12.06. "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and

58

C are satisfied.  Id.  The requirements of A are met by generalized persistent anxiety; persistent

irrational fear of a specific object, activity, or situation, which results in a compelling desire to

avoid it; recurrent severe panic attacks; recurrent obsessions or compulsions; or recurrent and

intrusive recollections of a traumatic experience.  Id.  The requirements of B are met by

demonstrating two of the following: "marked restriction of activities of daily living"; "marked

difficulties in maintaining social functioning"; "marked difficulties in maintaining concentration,

persistence, or pace"; and "repeated episodes of decompensation, each of extended duration."

Id.  C is met when the claimant is completely unable "to function independently outside the area

of one's home."  Id.

    After the first hearing, the ALJ found Claimant suffered from the following severe

medically determinable impairments: mild degenerative arthritis/disc disease of the lumbar

spine; mild osteoarthritis of the knees; questionable fibromyalgia; mild chronic obstructive

pulmonary disease; history of headaches, by report; major depressive disorder, without psychotic

features; posttraumatic stress disorder; and history of polysubstance abuse/alcohol dependence.

(Tr. 19).  In addition to the above impairments, the ALJ also found a history of hypertension,

controlled/"stable" and history of gastroesophageal reflux disease after the second hearing.  (Tr.

650).  Although the ALJ found Claimant suffered from severe impairments, the ALJ concluded

that they did not meet the requirements under either Listing 12.04 or 12.06.  The Court must

agree with the ALJ.

    In both hearings, the ALJ first concluded that the Claimant "has not evidenced, for any

12 consecutive months during the period at issue, any combination of debilitating psychological

symptoms that has imposed or is likely to impose any more than 'mild' limitation on daily

activities, or more than 'moderate' limitation on social functioning or concentration, persistence or pace, or that has resulted in or is likely to result in more than one or two episodes of decompensation." (Tr. 21, 651). To support these findings, the ALJ relied heavily on Claimant's repeated reluctancy to engage in individual counseling despite repeated suggestions by treating physicians. (Tr. 23, 654, 655, 656). The ALJ also noted Claimant's testimony, which indicated Claimant does household chores, cares for eight children, and occasionally shops for household items. (Tr. 26, 655). Additionally, the ALJ noted Claimant's admission to Dr. Chandran that she recently drank alcohol while playing pool with friends, which the ALJ viewed as contradicting Claimant's "contentions of compensable disability incidental to chronic pain, mental illness or inability to be around people." (Tr. 26). Finally, the ALJ cites numerous medical reports indicating Claimant's psychological condition. First, Claimant received GAF scores ranging from 52-61, all of which indicate "no more than mild to moderate psychological dysfunction." (Tr. 24). Second, in a September 2006 consultative psychological evaluation, Claimant's concentration was deemed moderately impaired, memory and judgment were deemed normal, and socialization was observed to be normal. (Tr. 655). Additionally, Claimant admitted that she did chores throughout the day, including making the bed, occasionally washing windows, and going grocery shopping. (Id.) Finally, Claimant's prognosis was deemed "fair." (Id.) Third, the ALJ found that an October 2007 physical examination failed to indicate or objectively establish any impairment-related conditions or symptoms "that would warrant a change in the residual functional capacity determination" ascribed after the previous hearing. (Id.) Finally, the ALJ again notes the numerous physician recommendations for Claimant to seek individual counseling.

Claimant does not argue that her impairments meet the C criteria under 12.04 and 12.06 but only argues that she meets the A and B criteria under both 12.04 and 12.06.  Therefore, the Court will forego an analysis under the C criteria.

It is not the job of the Court to determine fact, but only to determine that the ALJ properly followed the law.  The ALJ cited numerous medical reports and other evidence to support his conclusion that Claimant's impairments did not meet the requirements of either Listing 12.04 or 12.06.  Therefore, there was substantial evidence for the ALJ to find that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, 1.  Accordingly, the ALJ did not err.

2.      Whether Substantial Evidence Supports a Finding that Claimant was not Entirely Credible.

Claimant argues that the ALJ erred by improperly attacking Claimant's credibility.  Specifically, Claimant argues that although she stopped working due to her DUI, she has been unable to find new work because of her medical impairments.  Additionally, Claimant argues that the ALJ ignored the consistency of Claimant's statements concerning her impairments, based his decision on facts that ignored Claimant's mental and physical impairments, and ignored Claimant's statements regarding her education.

Commissioner contends that the ALJ correctly found that Claimant's subjective complaints of pain and functional limitation were not entirely credible.  Specifically, Commissioner contends that Claimant's daily activities undermine her complaints of inability to work, the objective medical evidence does not support Claimant's complaints, and Claimant's refusal to follow through with recommended medical treatment does not support her complaints.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment." Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

Claimant relies on Smith v. Heckler, 782 F.2d 1176 (4th Cir. 1986) and Murphey v. Brown, 810 F.2d 433 (4th Cir. 1987) in arguing that, when making a credibility determination, the ALJ has a "duty of explanation" and must "explicitly indicate the weight given to all relevant

evidence." Pl. Br. P. 8. According to Claimant, the ALJ's explanation is not sufficient to warrant the conclusion that Claimant is not credible.

In coming to his conclusion that Claimant's statements concerning the intensity, persistence and limiting effects of the symptoms are not credible, the ALJ complied with the two-part test in Craig. First, the ALJ found, in accordance with step one, that "claimant has had medically determinable impairments during the period at issue that could reasonably be expected to produce some of the symptoms that she has alleged." (Tr. 22, 652). Second, in accordance with step two, the ALJ dedicated nearly five pages of analysis in the first opinion and four pages of analysis in the second opinion explaining his reasoning for discrediting Claimant's testimony. (Tr. 22-27; 652-656).

In his detailed analyses, the ALJ first questions Claimant's reason for filing for benefits in conjunction with Claimant's alcohol and substance abuse problems. Claimant argues that, although she stopped working after receiving her first DUI, she has been unable to find work due to her impairments. Though Claimant indicated June 1, 2003, the date she was last employed, as the onset date of disability, Claimant "did not seek Social Security disability benefits until September 2004, some 15 months after the loss of her job and date of alleged disability 'onset.'" (Tr. 23). The ALJ finds this particular, especially in conjunction with Claimant's history of alcohol abuse. Claimant testified "that she continued to drink on 'special occasions' despite a history of alcohol dependence." (Id.) Claimant also admitted to beginning alcohol consumption at the age of 13-14 and regular consumption at 27. (Id.) This was particularly bothersome for the ALJ considering that Claimant was 27 on the onset date. (Id.) The ALJ also notes that in September 2003 Claimant was investigated incidental to allegations of child neglect related to

63

depression and possible alcohol abuse. (Id.) In a December 2003 psychiatric evaluation, Claimant admitted to rising with "'shakes' and 'alcohol cravings' after her DUI" but denied any recent cravings. (Id.) In the same interview, Claimant indicated that she volunteered at the West Virginia Children's Home as a cleaning person. (Id.) Additionally, Claimant admitted on June 22, 2004, that five days earlier she had consumed alcohol until she passed out. (Id.) Just three days later, Claimant was hospitalized and diagnosed with alcohol dependence. (Tr. 24). During the hospitalization, she "admitted to 'heavy alcohol consumption over the past year for which she had never been detoxed or attempted to quit at home' . . . [and admitted] that she drank alcohol every other day, had done so for the past one year and that she routinely drank to the point of blacking out." (Id.) In April 2005, Claimant also admitted to Dr. Chandron that she drank with friends, which, according to the ALJ, discredits Claimant's adamant denials in May and June. (Tr. 26). Finally, in June 2006, Claimant admitted to using alcohol on December 31, 2005. (Id.) Collectively, these statements, according to the ALJ, undermine Claimant's credibility.

The ALJ also relies on Claimant's cigarette and substance abuse. In the first opinion, the ALJ notes that despite a December 2003 denial Claimant "admitted to continued, occasional marijuana use" during her June 2004 hospitalization. (Tr. 23-24). In the second opinion, the ALJ summarily discredits Claimant's statements regarding her continued alcohol and substance abuse:

> The undersigned discussed evidence indicating that the claimant during the period at issue was reluctant to engage in beneficial therapy and continued to abuse alcohol, marijuana and tobacco while concurrently pursuing disability benefits. At an evaluation in September 2007, the claimant indicated that she was continuing to abuse tobacco at the rate of one and one-half packs of cigarettes daily. She denied any alcohol use since 'New Year's Eve 2006' and denied

64

having ever used 'illegal drugs.' As noted in the prior decision, the claimant had previously denied drinking or drug use on multiple occasions but had on other occasions admitted to ongoing drinking and marijuana use.

(Tr. 653).

Next, the ALJ heavily relies on objective medical evidence to discredit Claimant's subjective complaints. Claimant argues that the ALJ based his decision on facts that ignored Claimant's mental and physical impairments. However, in both opinions, the ALJ examines the objective medical evidence. The ALJ believes Claimant exaggerated her symptoms. Claimant stated she was treated for hypertension since the age of 7; however, "Dr. Beard saw no evidence of any end organ damage despite the claimant's statements indicative of more than 20 years of related treatment." (Tr. 24). Additionally on August 25, 2003, Claimant was found not to suffer from somatic disorder. (Id.) At that time, Claimant was being investigated for possible child neglect, and "she was believed to have 'exaggerated' her responses 'in an attempt to obtain treatment.'" (Id.) The ALJ also notes that, despite frequent complaints of headaches and back pain, objective imaging studies and other examinations revealed little in the area of spine abnormalities. (Tr. 25). Computerized tomography and magnetic resonance imaging studies and neurological examinations in December 2004 and September 2005 revealed no abnormalities in the head or brain. (Id.) Though examined in the September 2005 for daily headaches, during the examination, Claimant "stated that she was 'disabled' because of 'chronic pains' in her arms, legs and back." (Id.) Claimant again complained of chronic headaches in November 2005; however, there were no objective findings. (Id.) Claimant again underwent CT scans of her brain and magnetic resonance imaging studies of her lumbar spine in August - September 2006, with the results revealing no abnormalities. (Tr. 653-54).

Similarly, little objective evidence supports Claimant's complaints of knee and ankle pain and chronic joint pain. (Tr. 25-26). Nor is there evidence to support the Claimant's complaints of shortness of breath. In December 2004, Claimant complained of shortness of breath and having to stop four or five times when walking a quarter-mile hill near her home. (Id.) "Pulmonary function studies indicate only 'mild' chronic obstructive pulmonary disease and the claimant was continuing to abuse tobacco some two years later." (Tr. 26). Finally, to discredit Claimant's subjective complaints, the ALJ again cites Claimant's failure attend prescribed therapy, continued daily use of one and one-half packs of cigarettes, and failure to fill certain prescriptions following visits to doctors. (Tr. 645-55).

Claimant also contends that the ALJ erroneously supports his finding that Claimant was not fully credible by highlighting a discrepancy in Claimant's testimony about whether she obtained a GED. The Court is in no position to weigh the facts and make a decision as to Claimant's education, and it appears that the ALJ also neglected to make a determination. The ALJ only references the discrepancy with respect to Claimant's education in accordance with 20 C.F.R. § 416.964. Nowhere and in no way does the ALJ use the discrepancy to discredit Claimant. Moreover, even if the inconsistent statements had reflected poorly on Claimant's credibility, the ALJ still had more than a mere scintilla of evidence and appropriately discredited Claimant.

3.    Whether the ALJ Erred by Giving Substantial Weight to the Claimant's Use of Alcohol.

Claimant argues that the ALJ erred by giving substantial weight to Claimant's use of alcohol. First, Claimant argues that she would be disabled even without the use of alcohol. Second, Claimant argues that the ALJ improperly gave no credence to Claimant's denial

regarding use of alcohol.  In a September 2007 evaluation, Claimant denied any alcohol use since New Year's Eve 2006.  However, on other occasions, Claimant admitted ongoing drinking and marijuana use.  Based on the contradicting stories, Claimant argues, the ALJ improperly discredited the September 2007 statement.

Commissioner contends the ALJ was correct to consider the inconsistent statements regarding Claimant's alcohol use because the inconsistent statements bare on Claimant's credibility.  Additionally, Commissioner argues that the ALJ's consideration of Claimant's alcohol use was only one factor supporting the ALJ's conclusion regarding Claimant's credibility.

The ALJ must follow a five-step analysis to determine whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4) (2009).  If a person is found to be disabled and there is medical evidence of drug addiction or alcoholism, the ALJ "must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability."  20 C.F.R. § 404.1534(a) (2009).  If the Commissioner finds that a claimant is disabled and medical evidence of drug addiction or alcoholism exists, the Commissioner must follow the governing regulation to determine the materiality of the addiction to the disability.

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will

find that your drug addiction or alcoholism is not a contributing factor
material to the determination of disability.

20 C.F.R. § 404.1534(b) (2009).  Thus, "an ALJ must first conduct the five-step disability

inquiry without considering the impact of alcoholism or drug addiction.  If the ALJ finds that the

claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits,

and there would be no need to proceed with the analysis under 20 C.F.R. § 404.1535."  McGhee

v. Barnhart, 366 F.Supp.2d 379, 389 (W.D.Va. 2005).  If the claimant is found to be disabled and

there is medical evidence of the claimant's drug addiction or alcoholism, then the ALJ must

proceed under § 404.1535 to determine whether the claimant would still be disabled without

drug or alcohol use.  Id.  "In other words, if, and only if, an ALJ finds a claimant disabled under

the five-step inquiry, should the ALJ evaluate whether the claimant would still be disabled if he

or she stopped using drugs or alcohol."  Id.

When conducting the five-step inquiry to initially determine disability status, the ALJ

cannot separate the effects that may be due to substance use disorders.  Brueggemann v.

Barnhart, 348 F.3d 689, 694 (8th Cir. 2003).  "The ALJ must base this disability determination

on substantial evidence of [the claimant's] medical limitations without deductions for the

assumed effects of substance use disorders."  Id.

Here, the ALJ appropriately followed the regulations.  The ALJ had no obligation to find

alcohol dependency as a severe impairment before considering Claimant's use of alcohol.  In

fact, the ALJ was obligated to consider *all* medical evidence, including the effects of alcohol and

substance use, in coming to a conclusion about disability.  Therefore, the ALJ did not err by

considering the effects of Claimant's alcohol and substance use.  Additionally, the ALJ did not

err by not finding that Claimant would be disabled even without alcohol use.  A finding of

disability is a condition precedent to determining the materiality of alcohol to a claimant's disability. See Brueggemann, 348 F.3d at 693. Because the ALJ did not find Claimant to be disabled, he had no obligation to determine whether Claimant's alcohol use was a material factor to Claimant's disability. Finally, the ALJ did not err by giving weight to Claimant's conflicting statements. The ALJ can use all subjective evidence in evaluating credibility. Further, in determining disability, the ALJ was to consider all medical evidence. Included in this were Claimant's subjective complaints and statements regarding her alcohol and substance use.

Therefore, the ALJ correctly considered the effects of Claimant's alcohol use in his initial disability determination and had no obligation to determine whether the alcohol use was material to a disability finding. Accordingly, the Court cannot agree with Claimant's contentions and, the ALJ did not err.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's decision that Claimant did not suffer from a Listing impairment, the ALJ correctly evaluated Claimant's credibility, and the ALJ correctly evaluated Claimant's alcohol use.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written

objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: March 24, 2010

/s/ *James E. Seibert*

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE